[No. H001408. Sixth Dist. May 20, 1988.]

YOUNG RHEE, Plaintiff and Respondent, v.
EL CAMINO HOSPITAL DISTRICT, Defendant and Appellant.

478

480

COUNSEL

Steven L. Mayer, Howard, Rice, Nemerovski, Canady, Robertson & Falk, Gordon Simonds, Isabelle Greene Brown and Carpenter, Higgins & Simonds for Defendant and Appellant.

Robert P. Brorby, Dodge, Reyes, Brorby, Randall, Mitgang & Titmus, Brian McCarthy and McCarthy, Leonard & Spain for Plaintiff and Respondent.

## OPINION

**BRAUER, J.**—The Board of Directors of El Camino Hospital District affirmed a decision of its judicial review committee finding that Dr. Young Rhee did not meet the standards of the surgical community of the hospital. The hospital denied Dr. Rhee general surgical privileges, with the exception of anorectal surgery and ganglionectomies. He petitioned the superior court for a writ of mandate to overturn this decision on two grounds: the hospital's disciplinary procedure had violated his due process rights, and the decision was not supported by the evidence. The court granted the writ petition on the first ground and ordered that Dr. Rhee be reinstated at the hospital on a probationary basis for not less than one year. The hospital appeals, contending that it provided Dr. Rhee fair procedure under the law before denying his surgical privileges. We agree with the hospital. Consequently we order that the judgment granting the writ petition be reversed.

## Background

Dr. Rhee is a licensed physician and surgeon. In 1980, after completing his medical residency requirements, Dr. Rhee applied for appointment to the El Camino Hospital staff and requested general surgical privileges. On April 30, 1981, following a thorough evaluation of his education and training, the hospital admitted him to the probationary staff and assigned him to the department of surgery.

Under the hospital's bylaws, all initial appointments to the staff are probationary. A probationary staff member is subjected to a "period of observation . . . to determine his eligibility for continued staff membership in the staff category to which he was initially appointed and for exercising the clinical privileges granted in that Department . . . ." (Bylaws § 3.5-1.) The probationary period is to last not less than six months nor more than one year. (Bylaws § 4.3-1.)

Dr. Rhee was assigned four monitors who were to observe all his surgeries and report back to the surgical control committee. His chief monitor was Dr. Harrison J. Kornfield. On December 29, 1981, Dr. Kornfield wrote to the surgical control committee that Dr. Rhee's performance on hemorrhoidectomy operations was satisfactory, and recommended that monitorship be removed as to those surgeries. Accordingly, the surgical control committee informed Dr. Rhee by letter April 28, 1982, that sponsorship was no longer necessary as to anorectal cases, but that he was to continue being monitored for all other general surgery cases.

In July of 1982, Dr. Kornfield monitored Dr. Rhee's management of a patient with acute appendicitis, following which Dr. Kornfield wrote a letter to the surgical control committee strongly criticizing Dr. Rhee's handling of the case. As a result of this letter, the committee reviewed all reports of Dr. Rhee's monitors and reached the conclusion that he did not show surgical ability up to the level of the community. By letter dated October 26, 1982, the committee informed Dr. Rhee of its conclusion and advised him that his surgical privileges, other than for anal surgery, were suspended.

This decision was reviewed and affirmed by the hospital's medical executive committee (hereafter the MEC), and Dr. Rhee was informed of this action by letter dated November 12, 1982.

On November 22, 1982, an ad hoc investigating committee was appointed to review all of Dr. Rhee's cases and evaluate his performance. Dr. H. Ward Trueblood agreed to serve as chairman. Based on a preliminary report of

the ad hoc committee, in which concern was expressed about "the potential for serious morbidity" in rectal as well as other surgeries, the MEC acted to extend the suspension of Dr. Rhee's privileges to all surgeries. Dr. Rhee was informed of this on January 7, 1983.

The ad hoc committee then engaged in further review of the cases, and held an interview with Dr. Rhee, following which it submitted its final report to the MEC on February 1, 1983. The committee concluded that Dr. Rhee was qualified to do rectal cases without monitorship, and recommended that he be granted privileges in this area. As to other general surgery cases, it was the consensus of the committee that Dr. Rhee was "on the margin of meeting the standard set by El Camino Hospital . . . ." "To be perfectly fair," the committee recommended that Dr. Rhee be given another six months' trial period, with new monitors, before a final decision was made.

After conducting its own review and interviewing Dr. Rhee, the MEC rejected the recommendation of the ad hoc committee. This reversal appears to have been due in part to the fact that the monitor with the most exposure to Dr. Rhee's surgeries, Dr. Ott, had not been available to meet with the ad hoc committee, whereas he had been interviewed by the MEC. In any event, on March 16, 1983, the MEC informed Dr. Rhee of its conclusion that he did not meet standards and criteria for performing general surgical procedures, other than rectal and anal surgery. It recommended that he continue on a probationary basis for six months with respect to anorectal surgery only, and that he not be allowed to perform other surgical procedures. Dr. Rhee then requested a hearing before the hospital's judicial review committee (JRC I).

*JRC I*

On April 22, 1983, the hospital's chief of staff sent a letter to Dr. Rhee, setting forth the recommendations made by the MEC and identifying six problem areas, including four patient charts, which the MEC considered representative of its concerns. The four charts included the emergency appendectomy monitored by Dr. Kornfield and three other surgeries. Of these three, Dr. Ott had monitored one and assisted on two. The other two identified problem areas were failure to record certain information on patient charts and "failure to perform sufficient cases to remain skillful." The letter of formal charges then listed the physicians appointed to the review panel and the witnesses the hospital expected to call. The panel consisted of Drs. Lathrop, Wheat, Ignatius, Schmaelzle, and Wilbur, none of whom had previously reviewed Dr. Rhee's performance at any level.

The hearing took place on April 28 and 29, 1983. Neither side was represented by counsel. A reading of the transcript of JRC I reveals that the physicians engaged in this peer review process made every effort to take into account the possibility that a new surgeon embarking on a solo practice in an unfamiliar environment might be experiencing some "stage-fright." Panel members as well as witnesses were particularly struck by the disparity between Dr. Rhee's excellent credentials and training record and his performance as observed in the operating room. Dr. Watson, who represented the MEC, reported that his committee was so perplexed by this disparity that he took pains to reconfirm with the hospital of Dr. Rhee's residency that this was in fact that same Dr. Rhee. It was suggested that Dr. Rhee's timidity in the operating room might reflect cultural differences more than a lack of confidence. Dr. Ignatius, one of the panel members, felt that Dr. Rhee's apparent failure to make the transition from residency to practice might, at least in part, be due to the hospital not providing a supportive atmosphere. Dr. Ignatius thought that some of these problems could be alleviated if Dr. Rhee were assigned an older physician who would be willing to take the time to "teach [him] the . . . ropes."

In addition to these considerations, there was concern about the effect a denial of privileges at this hospital would have on Dr. Rhee's ability to maintain privileges at other hospitals.

The panel heard testimony from three monitors and from Dr. Trueblood, chairman of the ad hoc committee. One monitor, Dr. Duwe, testified that he was unable to make an informed judgment because the cases he had observed were limited both in number and degree of complexity. The other two monitors, Drs. Ott and Kornfield, testified as to specific problems concerning the surgeries they had observed; both concluded that they did not consider Dr. Rhee to be competent to perform general surgery without the guidance of an experienced surgeon.

In regard to Dr. Rhee's management of the appendicitis patient, which had been strongly criticized by Dr. Kornfield and formed the basis for the initial suspension of privileges, the panel heard evidence of problems attributable to other staff members, notably an anesthesiologist, which might have accounted in part for Dr. Kornfield's unfavorable report. For this reason the committee felt this particular case should be discounted. Testimony regarding the remaining three cases was largely provided by Dr. Ott.

On balance, the JRC I concluded that there was not sufficient evidence to support a suspension of privileges, especially in light of a telephone verification of Dr. Rhee's excellent performance during his residency. The panel members felt that Dr. Rhee should be given a "fresh chance" to prove

his skills before a different group of monitors. Accordingly, they recommended to the MEC that Dr. Rhee's privileges be restored for another year of probation, and that all of his surgeries during this year, including general and anorectal, be monitored by three new monitors. The MEC accepted this recommendation and on May 19, 1983, notified Dr. Rhee by letter that his prior privileges were restored. Dr. Ignatius was appointed as chief monitor. The other two monitors were Dr. Phillips and Dr. Nudelman.

Under the hospital's bylaws, a copy of the JRC decision must be sent to the physician who requested the hearing, within five days of the conclusion of the hearing. (Bylaws Addendum II, § 7.) Although the decision was forwarded to the MEC on May 2, 1983, the hospital failed to provide Dr. Rhee with a copy, despite three separate requests by him through counsel. It was not until after the final decision of the board of directors following JRC II, that Dr. Rhee received a copy of the JRC I decision.

## JRC II

Dr. Rhee's probationary year commenced in May of 1983. In September of that year, the surgery executive committee received a letter from Dr. Trueblood in which he criticized a spleen surgery which he had monitored when Dr. Rhee's assigned monitors were unavailable. The committee reviewed this case and two other cases of Dr. Rhee's which had produced unfavorable reports from two of his monitors. The committee's evaluation included an interview with Dr. Rhee, after which the committee informed him by letter that no action would be taken "at this time." The letter advised him, however, that he should make an effort to include his third monitor, Dr. Nudelman, on his next few cases: "[I]n all fairness, you should be observed by all of your monitors before any decision can be made about your status."

In May of 1984, at the end of his year of probation, Dr. Rhee requested that he be advanced to the active staff. After due consideration, the surgery executive committee recommended that he be granted active status for anorectal surgery and ganglionectomies only, and be denied all other general surgical privileges. The MEC approved this recommendation, whereupon Dr. Rhee requested a second JRC hearing.

On July 23, 1984, the MEC sent Dr. Rhee a letter of formal charges which set forth its conclusion that he did "not meet the standard of practice in the community for performing surgery," and listed three cases in support of its recommendation to deny privileges. These were the three cases the surgery executive committee had reviewed the previous year.

The hearing was held on August 24, 1984. The panel consisted of Drs. Lathrop, Wheat, Odom and Fuller. Drs. Lathrop and Wheat had also served on JRC I. Unlike JRC I, here both the hospital and Dr. Rhee were represented by counsel and the proceedings were presided over by a hearing officer.

The hospital's case consisted of the testimony of the three doctors who had each monitored one of three surgeries. Dr. Trueblood described Dr. Rhee's performance during the splenorrhaphy as that of a "first-year resident level surgeon" who "needed to be talked through really, essentially every step of the case." He was emphatic in his opinion that Dr. Rhee was "not . . capable of practicing surgery alone in this hospital." Dr. Phillips testified about a gall bladder procedure during which Dr. Rhee "required a great deal of help, and did not seem sure of what he was doing, and really was having a great deal of difficulty in doing the procedure." He felt that because of Dr. Rhee's poor performance, "there was a danger of having a major complication in what should have been a relatively easy procedure." Dr. Ignatius had monitored a hernia repair procedure. As Dr. Rhee's senior sponsor, he had also reviewed all of Dr. Rhee's charts. In Dr. Ignatius's opinion, Dr. Rhee exhibited a lack of experience, lack of ability to handle relatively simple problems, and "considerable confusion" in the course of the hernia repair. Dr. Ignatius expressed doubts about Dr. Rhee functioning as an independent nonproctored surgeon on major cases.

Dr. Rhee testified in his own behalf, and called as witnesses two doctors who had assisted him on surgeries at another hospital and had found his performance to be satisfactory.

On August 29, 1984, the JRC II announced its decision, in which it unanimously affirmed the MEC's recommendation. Based upon the staff reports and the testimony of Drs. Phillips, Trueblood and Ignatius, the panel found that Dr. Rhee's surgical techniques were "tedious, tentative [and] unsure" and that he did not "meet the general standards of the surgical community at El Camino Hospital, with the exception of anorectal surgery and ganglionectomies." The decision also contained specific findings as to each of the three cases, and the additional finding that "the major surgical caseload of Dr. Young Rhee has not been sufficient to improve his surgical competence to the standards of the surgical community at El Camino Hospital."

Dr. Rhee appealed this decision to the hospital's board of directors which unanimously affirmed it. Whereupon Dr. Rhee sought relief in the superior court.

*The Writ Proceedings*

Dr. Rhee's writ petition under Code of Civil Procedure section 1094.5 alleged that the hospital had not proceeded in the manner required by law, and that the findings made by JRC II were not supported by substantial evidence.

Following a hearing, the court issued its decision granting the writ petition, "based upon a denial of procedural due process," specifically: "[hospital's] failure to follow its by-laws, lack of notice that petitioner's surgical case load was a basis for his suspension and subsequent findings, failure to provide a copy of the first Judicial Review Committee report to petitioner, and the overlapping committee members at the investigatory, prosecutorial, and adjudicatory levels." No findings were made regarding the evidence.

The court ordered that Dr. Rhee's surgical privileges be restored for an additional one-year probationary period and that new monitors be appointed.

## THE STANDARD OF REVIEW

■ In an administrative mandamus action, the superior court is to decide on the basis of the administrative record "whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law . . . or the findings are not supported by the evidence." (Code Civ. Proc. § 1094.5.) Since the trial court did not reach the issue of sufficiency of the evidence, the appeal before us now is limited to the procedural aspect of this inquiry. The superior court received evidence in the form of two declarations of Dr. Rhee and his attorney. With the exception of this evidence, which we discuss in section 3 below, our function is no different from the trial court's: we decide on the record whether there was a fair hearing and whether there was any prejudicial abuse of discretion. (*Hackethal* v. *California Medical Assn.* (1982) 138 Cal.App.3d 435, 448 [187 Cal.Rptr. 811].)

## DUE PROCESS IN THE CONTEXT OF MEDICAL DISCIPLINARY PROCEEDINGS

Before addressing the specific issues raised by this case, we pause to orient ourselves regarding the concept of procedural due process in this context.

■ A hospital may not deprive a physician of staff privileges without granting him minimal due process of law protection. (*Cipriotti* v. *Board of*

*Directors* (1983) 147 Cal.App.3d 144, 155-156 [196 Cal.Rptr. 367].) This does not, however, compel adherence to formal proceedings or to any single mode of process. Instead it may be satisfied by any of a variety of procedures. (*Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 555 [116 Cal.Rptr. 245, 526 P.2d 253].) The hospitals themselves have the primary responsibility for providing a fair procedure which ensures that an applicant receive adequate notice of the charges against him and a reasonable opportunity to respond. (*Ibid.*)

■ A physician's right to pursue his livelihood free from arbitrary exclusionary practices must be balanced against other competing interests: the interest of members of the public in receiving quality medical care, and the duty of the hospital to its patients to provide competent staff physicians. (*Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332, 337-341 [183 Cal.Rptr. 156].) Consequently, disciplinary procedures involving physicians have developed primarily from a protective rather than a punitive purpose. (*Cipriotti* v. *Board of Directors, supra,* 147 Cal.App.3d, at p. 157.) The hospital has "a direct and independent responsibility to its patients of insuring the competency of its medical staff and the quality of medical care provided . . . ." (*Elam* v. *College Park Hospital, supra*, at p. 346.) Hospitals must be able to establish high standards of professional work and to maintain those standards through careful selection and review of staff. And they are required to do so by both state and federal law. (Cal. Code Regs., tit. 22, § 70701, subd. (a)(7) and § 70703, subds. (a) and (b); 42 C.F.R. § 482.22 (1987); *Hay* v. *Scripps Memorial Hospital* (1986) 183 Cal.App.3d 753, 756 [228 Cal.Rptr. 413].)

■ We do not wish to denigrate the importance of due process rights; however, it must be emphasized that this is not a criminal setting, where the confrontation is between the state and the person facing sanctions. Here the rights of the patients to rely upon competent medical treatment are directly affected, and must always be kept in mind. An analogy between a surgeon and an airline pilot is not inapt: a hospital which closes its eyes to questionable competence and resolves all doubts in favor of the doctor does so at the peril of the public.

■ The appropriate standard to bring to bear on judicial review of hospital disciplinary procedures is therefore this: courts must not interfere to set aside decisions regarding hospital staff privileges unless it can be shown that a procedure is "substantively irrational or otherwise unreasonably susceptible of arbitrary or discriminatory application . . . ." (*Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d. 614, 626-627 [166 Cal.Rptr. 826, 614 P.2d 258], fn. omitted; *Smith* v. *Vallejo General Hospital* (1985) 170 Cal.App.3d 450, 456 [216 Cal.Rptr. 189].)

## ISSUES

The overriding issue is whether the procedure leading up to the hospital's restriction of Dr. Rhee's surgical privileges was a fair procedure. We have grouped the various sub-issues into three categories: 1) was Dr. Rhee provided impartial adjudicators; 2) was there adequate notice of the charges; and 3) did hospital fail to follow its own bylaws, and, if so, were Dr. Rhee's rights prejudiced thereby?

1. *Bias in the Peer Review Process: The Issue of Overlapping Functions*

For the most part this discussion focuses on the claim that there was an impermissible mingling of adjudicatory, prosecutorial and investigatory roles in the course of the peer review process. In addition, Dr. Rhee makes some general assertions regarding bias, which do not involve the rule against overlapping functions, and which we will take up briefly at the end of this section.

 Due process of course includes the right to be heard before an impartial tribunal. (*Applebaum* v. *Board of Directors* (1980) 104 Cal.App.3d 648, 657 [163 Cal.Rptr. 831].) The fact that some investigatory, prosecutorial and adjudicatory functions may have been combined, however, will not ordinarily constitute a denial of due process, "unless the facts of a case show foreclosure of fairness as a practical or legal matter." (*Id.* at p. 658; *Withrow* v. *Larkin* (1975) 421 U.S. 35, 58 [43 L.Ed.2d 712, 729-730, 95 S.Ct. 1456]; *Griggs* v. *Board of Trustees* (1964) 61 Cal.2d 93, 98 [37 Cal.Rptr. 194, 389 P.2d 722].)

Both parties have relied upon the *Applebaum* case. Since *Applebaum* appears to be the leading California decision in this area, we will start with a brief summary of that case to provide a yardstick against which to measure the hospital's procedure.

Dr. Applebaum was one of five doctors who had obstetrical privileges at a private hospital. Two of the five, Drs. Furman and Hembrow, were board certified specialists who were expected to be consulted on nonroutine cases. The controversy regarding Dr. Applebaum was precipitated by the head nurse expressing concern to Dr. Furman about Dr. Applebaum's delivery techniques. Furman then wrote to the hospital's chief of staff requesting an investigation and listing various charges. The hospital's executive committee reviewed the matter and appointed an ad hoc committee. Furman and Hembrow were both members of both of these committees. The ad hoc committee's recommendation that Dr. Applebaum's privileges be suspend-

ed was reviewed by the executive committee, which upheld the recommendation. Five of the six members of the ad hoc committee, including Drs. Furman and Hembrow, attended the executive committee meeting. Dr. Applebaum appealed and a review panel was appointed which consisted of three doctors who had not previously been involved in the dispute. In the midst of the hearings, however, before a decision was reached, two of these three were appointed to the executive committee and attended a meeting of that committee at which Dr. Applebaum's case was discussed.

The trial and appellate courts concluded that this scenario presented a "practical probability of unfairness." (*Applebaum* v. *Board of Directors supra,* 104 Cal.App.3d at p. 659.) The instigator of the charges also conducted the investigation and had overlapping membership in the committee which reviewed both the initial and final decision, the same committee to which a majority of the formal adjudicators later belonged. In such a situation, "the risk of prejudgment or bias was too high to maintain the guarantee of fair procedure." (*Id.* at p. 660.)

Dr. Rhee has touched upon a number of instances of intermingled functions which he claims have, both separately and cumulatively, similarly tainted the disciplinary process here. We consider each of these in turn, keeping in mind the standard expressed in *Applebaum* and the scope of due process in the context of a hospital's quality assurance program.

*Dr. Kornfield.* Dr. Kornfield was assigned as Dr. Rhee's chief monitor when Dr. Rhee was first admitted to the probationary staff in 1981. It was Dr. Kornfield's concern over an appendectomy he monitored which led to Dr. Rhee's summary suspension in 1982 and the eventual hearing in JRC I, at which Dr. Kornfield was a witness.

Dr. Kornfield did not participate in JRC II, either as judge or witness. It is therefore somewhat obscure to us how his role in the early stages in any way affected the impartiality of that tribunal. Dr. Rhee claims that Dr. Kornfield's "disciples" testified against him at JRC II, that Dr. Kornfield's "continuing impact" was felt through Dr. Phillips, who was a monitor and witness in the JRC II proceedings, and that "the shadow of Dr. Kornfield" was improperly invoked during JRC II. This last refers to a point in the JRC II proceedings where counsel for the hospital asked Dr. Rhee if he thought Dr. Kornfield's testimony in the prior proceedings had been "overly critical." Before Dr. Rhee could answer, however, objection to this reference was raised and sustained. We fail to perceive any enduring harm in this single allusion to prior testimony. Dr. Rhee's other claims with regard to Dr. Kornfield, including a suggested complicity with Dr. Phillips, are equally without substance.

*Dr. Phillips.* Dr. Phillips was a member of the ad hoc committee which initially reviewed Dr. Rhee's cases prior to JRC I. In addition, he was appointed a monitor following JRC I and was a witness against Dr. Rhee at JRC II. Dr. Rhee contends that Dr. Phillips's membership in the ad hoc committee prejudiced him as a monitor and witness. The final report of the ad hoc committee, however, was favorable to Dr. Rhee. The committee recommended to the MEC that full privileges be restored as to rectal cases and that Dr. Rhee be granted a six-month extension of his probation with respect to general surgery. It is inconceivable to us how Dr. Phillips's participation in this decision could have compromised his impartiality as a monitor. These facts do not raise a "practical probability" of unfairness. (*Applebaum* v. *Board of Directors, supra,* 104 Cal.App.3d 648, 659.)

*Dr. Trueblood.* Dr. Trueblood testified at JRC I in his capacity as chair of the ad hoc committee and at JRC II as a witness for the hospital, having observed a spleen operation performed by Dr. Rhee. Dr. Trueblood's appearance at both JRC hearings does not amount to an impermissible overlap of functions. He was a witness in each instance and in each his testimony was based upon entirely different events. His role as chair of the ad hoc committee would in no way disqualify him as a witness. In any event, as discussed above with regard to Dr. Phillips, the ad hoc committee's decision had been favorable to Dr. Rhee, and does not constitute a reasonable basis for prejudice. Moreover, Dr. Rhee himself chose Dr. Trueblood to monitor the spleen surgery, having heard his testimony at JRC I, and with full knowledge of his participation as chair of the ad hoc committee.

*Dr. Ignatius.* Dr. Ignatius served as a member of the JRC I panel, after which he was appointed a monitor and then became a witness in the JRC II proceedings. Again, the suggestion is that Dr. Ignatius may have approached his monitorship duties with a preconceived animus towards Dr. Rhee. The record, however, reveals no support for this claim. The JRC I decision was favorable to Dr. Rhee; it resulted in a reversal of the MEC recommendation and provided Dr. Rhee another year's probation. Moreover, Dr. Ignatius expressed his personal belief that Dr. Rhee's apparent shortcomings in the operating room were perhaps the result of the hospital's failure to provide the proper support and guidance. In his words, Dr. Ignatius was "most anxious that [Dr. Rhee] make a success at this hospital." There is nothing in the record which belies this.

Counsel for Dr. Rhee conceded that he didn't believe Dr. Ignatius "has anything in for Dr. Rhee at all, in any way." In fact any allegations regarding the bias of the monitors are somewhat surprising in light of the fact that Dr. Rhee's counsel informed the JRC II that "I have not raised an issue of bias as to any of the monitors."

*Dr. Odom.* Dr. Odom was a member of the JRC II panel. His only other involvement with Dr. Rhee had been more than two years earlier, when he (Dr. Odom) served as chairman of the hospital's surgical control committee. In that capacity, he had informed Dr. Rhee that he would no longer need monitors as to anal/rectal cases, but that monitorship would continue as to all other surgeries. This was before any complaint had been made regarding Dr. Rhee's surgical competence. Dr. Odom's involvement was therefore not only slight and remote in time, it was also not even part of the disciplinary process.

*Drs. Lathrop and Wheat.* Drs. Lathrop and Wheat served on both JRC I and JRC II. Thus in both proceedings their roles were as adjudicators. Dr. Rhee asserts that their participation in JRC I prejudiced them against him in JRC II. Once again, this is not borne out by the record. As we have noted repeatedly, the decision in JRC I was favorable to Dr. Rhee, actually reversing the recommendation of the medical staff executive committee to suspend his general surgical privileges. The notion that this decision reflected any prejudice on the part of the panel members is conclusively negated by both its substance and its tone. For example, the decision closes with this paragraph: "The Committee has documented that Dr. Rhee performed extremely well in the structured surgical environment of his residency training. We are aware that the transition from that type of environment to the solo private practice setting can be very difficult, and that some physicians cannot make this transition satisfactorily. Time may tell whether this is the case with Dr. Rhee, but we feel that he should be given an additional opportunity to demonstrate his competence." The decision was signed by Dr. Lathrop as chairman of the JRC.

Furthermore, Dr. Rhee consented to the use of the same panel members as had composed JRC I. He takes issue with this point, claiming that he would not have consented had he known the full contents of the decision in JRC I, which the hospital failed to provide him. The crux of his claim is that Drs. Wheat and Lathrop were biased on the issue of his surgical caseload. Since this claim encompasses issues raised in the following two sections regarding adequate notice of charges and the hospital's failure to follow its own bylaws, we will address it in the course of those discussions.

As a last instance of overlapping functions, Dr. Rhee points out that two members of the same law firm represented the medical staff and the hospital's board of directors during various stages of JRC I and II. The concept of overlapping functions applies only to test the impartiality of adjudicators. We are aware of no rule requiring hospitals to hire separate counsel to represent the medical staff and the board in these proceedings.

Finally, Dr. Rhee argues that the record of JRC II shows that the panel members were predisposed against him, that they took on a prosecutorial air by participating in the questioning of the witnesses, and that they credited the hospital's witnesses while unfairly criticizing his. The record does not reveal to us any evidence of bias. Furthermore, Dr. Rhee agreed at the start of the hearing that the panel members were free to ask questions of the witnesses. The remaining contentions touch upon issues involving the sufficiency of the evidence and do not merit a full-blown discussion here.

In summary, we return to the observations of the court in *Applebaum*. The presence of overlapping roles does not per se constitute a violation of due process. And bias cannot be presumed in the absence of facts establishing the probability of unfairness as a practical matter. The circumstances which tainted the decisionmaking process in *Applebaum* simply do not exist here. Dr. Rhee's claims, even when considered together, do not amount to a denial of due process.

## 2. Adequate Notice of Charges: "The Caseload Issue"

There are two claims regarding notice. The first is a minor technical matter: the hospital's formal notice of charges referred to bylaw section 8.1, whereas the JRC II decision cited bylaw section 3.2. Secondly, Dr. Rhee claims that he received no notice that JRC II would be considering the "charge" that his caseload was not sufficient to improve and maintain his surgical skills.

The formal charges against Dr. Rhee were set forth in a letter from the MEC which informed him the committee had concluded that, with the exception of rectal and ganglion surgeries, he did "not meet the standard of practice in the community for performing surgery." The letter recited that its recommendation for suspension of privileges "was made according to Article VIII, § 8.1" of the bylaws. The three case charts which supported the recommendation were then listed and described. There was no specific "charge" regarding Dr. Rhee's caseload; however, a separate paragraph of the letter was devoted to a summary of the following statistics. Dr. Rhee had managed 13 surgical cases during the probationary year. Of these, six were rectal and the surgeries "went well." One case was referred to another specialist. Of the remaining six general surgical cases, three had been unfavorably evaluated by the monitors.

Findings made by JRC II included specific findings regarding each of the three cases, general findings that Dr. Rhee did not meet the standards of the surgical community at the hospital and this finding: "(g) Based upon the evidence, the Committee finds that the major surgical caseload of Dr.

Young Rhee has not been sufficient to improve his surgical competence to the standards of the surgical community at El Camino Hospital."

The closing paragraph of the JRC II decision said this: "It is further the conclusion of this Committee that pursuant to El Camino Hospital Staff By-Law Article III, Section 3.2-1a, this recommendation is based upon his failure to demonstrate his ability to perform the type of surgery for which he is seeking privileges."

■ The claim that Dr. Rhee was in some way prejudiced by the reference to Article VIII in the charging letter and the apparent reliance upon Article III by the JRC exalts form over substance. Article VIII describes corrective action and provides that the MEC may, following certain investigation and review, take such actions as "[r]ecommending reduction, suspension or revocation of clinical privileges." (Bylaw § 8.1-4d.) This is precisely what the committee did. Article III, on the other hand, outlines the criteria for membership on the hospital staff. Only licensed practitioners who, among other things, can "demonstrate to the Hospital Staff and the Board that any patient treated by them will receive care of the generally recognized professional level of quality and efficiency" will be deemed qualified for active membership on the hospital staff. (Bylaw § 3.2-1.) This is exactly what Dr. Rhee could not demonstrate. The parties agreed at the commencement of JRC II that, since Dr. Rhee had not yet been granted full privileges, the proceeding was properly under Article III rather than Article VIII. Nonetheless, there is no discrepancy or conflict between these two sections insofar as the standard they express. The mistaken reference to Article VIII in the charging letter could not possibly have caused confusion regarding the charges.

Dr. Rhee argues that the JRC's reliance upon Article III, without prior notice to him, deprived him of the opportunity to present evidence regarding his "experience, background, training, demonstrated ability, evidence of current licensure," etc., all of which are qualifications for membership under Article III. (Bylaw § 3.2-1.) This claim is also untenable. There was no question regarding Dr. Rhee's experience, background and training. The only qualification at issue was his "demonstrated ability." As to this there was adequate notice and ample opportunity to present his case.

■ Whether there was notice regarding Dr. Rhee's surgical caseload presents a somewhat more difficult issue. Dr. Rhee contends the hospital did not give him formal notice that the size of his caseload would be an issue before the JRC; therefore the JRC impermissibly based its decision to suspend his privileges on a finding that his major surgical caseload was not sufficient to improve his surgical skills. Hospital argues that the finding

regarding Dr. Rhee's caseload was "surplusage," that any error was harmless, and that in any event Dr. Rhee had actual notice that there was concern about his light caseload. Dr. Rhee counters this last argument by pointing out that he never received a copy of the JRC I decision which specifically expressed this concern.

The hospital's "surplusage" argument derives from the case of *Steele* v. *L. A. County Civil Service Com.* (1958) 166 Cal.App.2d 129 [333 P.2d 171]. In that case the civil service commission acted to reduce the rank of an employee from grade IV to grade I. The "reduction" letter charged her with failing "to exercise diligence, intelligence or interest in the pursuit of her duties," and included specific factual allegations supporting these charges. The hearing officer found the charges to be true; however, the decision included an additional statement to the effect that the employee was not "physically or emotionally able to perform the duties of [a deputy clerk IV]. . . ." The employee raised a violation of due process claim on the ground that she had not had notice that her physical and emotional ability would be a basis for the decision. The court rejected this argument, finding that the "gratuitous" statement made by the hearing officer "was but an additional observation superimposed upon his 'conclusion' that 'there was sufficient substantial evidence to support the charges . . . .' " (*Id.* at p. 136.)

The hospital contends that *Steele* determines the issue here: the JRC's "finding" regarding Dr. Rhee's caseload was simply an observation which helped to explain why Dr. Rhee's surgical skills were not up to par. We are persuaded by this line of reasoning. The only issue before the JRC II was whether Dr. Rhee was performing surgery at the level of the hospital community. The panel found that he was not. The fact that he had not had enough practice to improve his skills was beside the point. This statement was not necessary to the JRC's decision and in no way invalidated it. As in the *Steele* case, it appears that a general observation was inadvertently included as a formal finding. As the *Steele* court noted, "[f]indings of administrative tribunals are liberally construed for the reason, among others, that they are often the product of laymen operating in an unfamiliar field." (*Id.* at p. 136.)

Dr. Rhee does not contend that the challenged "finding" was incorrect or not supported by the evidence. Nor can he quarrel with the proposition it represents, that in surgery, as well as any endeavor, practice makes perfect. That proposition is self-evident and need not in our view be expressed in the form of a formal charge. Even had it been, there is no indication that Dr. Rhee would have, or could have, conducted his defense in any way differently. Moreover, the letter from the MEC, which expressly referred to

Dr. Rhee's caseload, and in particular to the number of general surgeries he had handled in his probationary year (six, three of which received unfavorable reports), supplied adequate, if not formal, notice.

Dr. Rhee's final argument regarding the caseload issue is based upon the hospital's failure to provide him with a copy of the JRC I decision immediately following that hearing. Since this involves a violation of the hospital's bylaws, we discuss it in the next section.

3. *Violations of the Hospital Bylaws: Failure to Provide a Copy of the JRC Decision*

■ As we noted in our introductory remarks, the concept of due process in a hospital disciplinary setting does not require rigid adherence to any particular procedure. (*Pinsker* v. *Pacific Coast Society of Orthodontists, supra,* 12 Cal.3d 541, 555.) Moreover, it must be kept in mind that the hospital has a duty not only to accord due process protection to the doctor, but also to provide quality medical care to its patients. (*Elam* v. *College Park Hospital, supra,* 132 Cal.App.3d 332, 340.) Consequently, it cannot be said that a violation of a hospital's bylaws establishes a denial of due process in every case. (*Tiholiz* v. *Northridge Hospital Foundation* (1984) 151 Cal.App.3d 1197, 1203 [199 Cal.Rptr. 338].) Rather the question is whether the violation resulted in unfairness, in some way depriving the physician of adequate notice or an opportunity to be heard before impartial judges.

There is no question that the hospital violated its own bylaws by failing to forward a copy of the JRC I decision to Dr. Rhee. In the year between the two hearings, Dr. Rhee through his counsel, made three specific requests for a copy of the decision, to no avail. The hospital offers no excuse for this dereliction. Instead it argues that Dr. Rhee could not have been prejudiced by not receiving a copy of the decision, since he was fully aware of its terms. Dr. Rhee maintains that if he had seen the JRC I decision, he would have known that the panel considered his surgical caseload to be a potential problem. And, had he known this, he would not have agreed to two members of JRC I, Drs. Wheat and Lathrop, participating on JRC II. Both Dr. Rhee and his attorney made this last assertion in declarations filed in the mandate proceedings.

Although Dr. Rhee did not receive a copy of the decision itself, he was provided written notice of it. This was accomplished by letter from the MEC, which informed him that, pursuant to the decision of the JRC, his general surgical privileges had been restored for an additional year's probationary period and three new monitors had been appointed to observe his performance during that year. In the written decision of the panel, however,

the JRC had stated that it wished to emphasize several points. One was this: "the biggest part of the problem was that Dr. Rhee has not had enough cases for it [the JRC] to make an adequate evaluation of his competence to practice general surgery, especially in the absence of any adverse results. We feel that he should be given an additional chance, and agree with the selection of new monitors who will attempt to evaluate his competence in the year ahead. [¶] We realize that Dr. Rhee's lack of a sufficient number of cases was a problem in this evaluation and this may continue to be a problem in a future evaluation. If this lack of an adequate number of cases to maintain surgical skills continues, this will have to be considered at a future evaluation."

Dr. Rhee argues that because he did not receive this decision, he was 1) deprived of notice that his light caseload was considered by the panel members to be a problem and 2) prejudiced by the further participation of Drs. Wheat and Lathrop, whose presence on the JRC II panel he would otherwise have vetoed.

The first point is not supported by the record. The initial notice of formal charges before JRC I clearly informed Dr. Rhee that, in the opinion of the medical staff, he had "fail[ed] to perform sufficient cases to remain skillful . . . ." Moreover, he was present throughout the first JRC hearing, when the problem of his inadequate caseload was discussed. In his summation, Dr. Watson, who represented the medical staff, said this: "One of the major concerns we had was the fact he was doing so little major surgery that he had no way to keep his skills up . . . ." Two panel members, Drs. Wilbur and Schmaelzle, joined in the discussion, and the following colloquy took place:

"DR. WATSON: . . . you named one of the problems, there are only three or four cases in two years.

"DR. WILBUR: So the question is, can you make an adequate judgment on the basis of those three cases . . . .

"DR. WATSON: Yes, of course that's the question. But the problem is, what's going to happen in the next six months. Where is the evidence that there will be more work in the next six months.

"DR. WILBUR: *If he has a six month monitorship for all cases and he doesn't bring in an adequate number of cases then he can't have privileges.*

"DR. SCHMAELZLE: *Their concern is his skill will atrophy if he's simply not doing cases anywhere.*

"DR. WILBUR: I understand that." (Italics added.)

The basis of the JRC I decision was that there simply wasn't enough information to sustain a denial of privileges, particularly in light of Dr. Rhee's excellent record at his training hospital. The purpose of allowing him another year of probation was to give him the opportunity to demonstrate, before a new set of monitors, that his surgical skills were up to par. The clear import of the decision is that it was incumbent upon Dr. Rhee to perform as many surgeries as possible during the year's time. We fail to see how he could have come away from the JRC I hearing without this understanding. While we do not in any way condone the hospital's failure to provide him with a copy of the decision in JRC I, we cannot find that this would have added significantly to what had been made clear in the charges and at the hearing.

■ We turn to the declarations, in which Rhee and his attorney assert that he would not have agreed to Drs. Wheat and Lathrop serving again had he received his copy of JRC I's decision. Dr. Rhee points out that the trial court impliedly accepted the truth of this declaration, and therefore the prejudice to him, since one of the stated grounds for the court's decision was "failure to provide a copy of the first Judicial Review Committee report to Petitioner." On appeal we are obliged to accept factual determinations of the trial court. There were no counterdeclarations, nor could there have been, since Dr. Rhee's expression of subjective intent was virtually uncontrovertible. But his declaration is not only self-serving; we question whether it proves anything. As we have discussed, the JRC I decision would not have provided Dr. Rhee information that he did not already have. Furthermore, the question whether he would have consented to Drs. Wheat and Lathrop is meaningless unless his consent was required. Finally, the statements of Dr. Rhee and his attorney, by themselves, do not provide a reasonable basis for concluding that Drs. Wheat and Lathrop harbored a prejudice.

Dr. Rhee appears to take for granted the proposition that he could veto the appointment of Drs. Wheat and Lathrop because of their prior participation. The rule against overlapping functions, however, applies to prevent participation at ascending levels of the process, so that a participant will not be in the position of reviewing his own decision or judging a man whom he has either charged or investigated. Neither Dr. Wheat nor Lathrop participated as an accuser or investigator at any stage of either proceeding. Though they were certainly familiar with Dr. Rhee's history at the hospital, prior knowledge of the factual background which bears on a decision is not sufficient to disqualify a decisionmaker. (*City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 782 [122 Cal.Rptr. 543, 537 P.2d 375].)

Most importantly, the two JRC hearings were completely separate proceedings. JRC I concluded when its decision was accepted by the MEC. JRC II did not review the prior decision, but was based on entirely new cases which had occurred thereafter. While Dr. Rhee was certainly entitled to a panel composed of physicians who had not actively participated at any other level of the disciplinary processs, he did not necessarily have the right to panel members who had not participated on any previous panel, particularly one which had bent over backwards to rule in his favor.

There is nothing in the record to support Dr. Rhee's assertion after-the-fact that these two panel members were prejudiced against him in regard to the so-called caseload issue. He claims that, based upon their personal knowledge, Drs. Wheat and Lathrop introduced the caseload issue into the proceedings in JRC II. We do not find this in the record. The medical staff presented three witnesses, whose testimony on direct examination was confined to the three cases upon which the charges were based. In his cross-examination, Dr. Rhee's counsel introduced the issue by arguing that the number of cases Dr. Rhee had performed, together with the lack of serious morbidity, demonstrated his competence to perform surgery. And it was Dr. Rhee's counsel who supplied the panel with the statistics regarding the doctor's overall caseload.

■ Dr. Rhee has alleged several other violations of hospital bylaws, all of which occurred in the early stages of the process leading up to the first JRC hearing. These we can quickly dispense with.

In August of 1982, Dr. Kornfield wrote a letter to the surgical control committee criticizing an appendectomy performed by Dr. Rhee. On October 25, 1982, this committee suspended his privileges without interviewing him, and the MEC confirmed this action, again without an interview, on November 11. It was only after this summary procedure that the ad hoc committee was formed and a full investigation was launched. Dr. Rhee claims the initial actions of the surgical control committee and the MEC were not authorized by the bylaws, and tainted the entire procedure, including the eventual review in JRC II.

We are not persuaded that the actions of these two committees in 1982 had any effect whatsoever on the JRC II hearing two years later. We reiterate that JRC I and II were separate proceedings. JRC II considered only cases which were reviewed after the JRC I proceedings had concluded. Moreover, both the ad hoc committee and the MEC did in fact interview Dr. Rhee and conduct a full investigation before the MEC made the recommendation which precipitated JRC I. Finally, the bylaws do provide for a summary procedure in those cases where immediate action is necessary "to

protect the life of any patient(s) or to reduce substantial risks of immediate injury or damage to the health or safety of any patient . . . ." (Bylaw 8.2-1.) Both the surgical control committee and the MEC advised Dr. Rhee of his right under the bylaws to appeal the summary suspension and he chose not to do so. We find no prejudicial abuse of discretion here.

## Summary

In summary we conclude that the procedure followed by the hospital, which culminated in its denial of Dr. Rhee's application for general surgical privileges, was consistent with the requirements of due process. We stress again the point that the hospital stands in the middle between two competing factions: though it has a responsibility to treat the doctor fairly, its primary duty is to its patients to insure the competence of its medical staff. In the exercise of this duty, the hospital must be free to establish and enforce selection and review procedures, so long as they do not result in arbitrary or discriminatory practices. In this case the record reveals no unfairness. To the contrary, it appears that the hospital provided Dr. Rhee every procedural safeguard and professional courtesy in the course of its decisionmaking process.

The judgment is reversed. Unless Dr. Rhee abandons his contention that the hospital's decision was not supported by the evidence, the trial court is directed to address that issue. Costs are awarded to appellant.

Agliano, P. J., and Chapman, J.,* concurred.

---

* Assigned by the Chairperson of the Judicial Council.