[No. B113235. Second Dist., Div. Four. Sept. 29, 1998.]

WALLACE A. GOODSTEIN, Plaintiff and Respondent, v. CEDARS-SINAI MEDICAL CENTER, Defendant and Appellant.

COUNSEL

Horvitz & Levy, David M. Axelrad, Sandra J. Smith, Latham & Watkins, Gordon D. Simonds and Reba W. Thomas for Defendant and Appellant.

Herbert Papenfuss for Plaintiff and Respondent.

OPINION

VOGEL (C. S.), P. J.—

## INTRODUCTION

Dr. Wallace A. Goodstein (Goodstein), a plastic surgeon, held staff privileges at Cedars-Sinai Medical Center. The "Well-Being of Physicians Committee," a peer review committee whose purpose is to investigate claims that a physician has a substance abuse problem endangering patient safety, learned from several credible and unconnected sources about a potential problem with Goodstein. After evaluating the information, the committee decided that further investigation was warranted. It requested a meeting with Goodstein. He consented. In the course of the meeting, Goodstein demanded to know the sources of information which had triggered the investigation. The committee members, citing a well-grounded policy of nondisclosure, declined to give him the information. After the meeting, the committee members met and, based upon governing hospital rules, decided to ask Goodstein to submit to a psychiatric evaluation and random urine testing. Goodstein refused. Pursuant to the pertinent hospital rules, Goodstein's refusal resulted in suspension of his staff privileges. After exhausting his intrahospital administrative remedies to contest the suspension, Goodstein

filed a writ petition in the superior court to gain reinstatement. The superior court granted him relief, agreeing with his claim that the nondisclosure of the identities of the initial complainants rendered the investigation and subsequent suspension unfair. Cedars-Sinai Medical Center has appealed from that decision. We reverse, finding that sound public policy considerations support the policy of nondisclosure and that Goodstein, as he now concedes, was otherwise afforded fair procedure.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Well-Being of Physicians Committee*[1]

At Cedars-Sinai Medical Center (Hospital), a self-governing organized medical staff is responsible for monitoring the adequacy and quality of medical care given to the patients. The medical staff operates through several peer review committees. One such committee is the Well-Being of Physicians Committee (the Committee), the purpose of which is to protect patient care by detecting and providing help to physicians who are having psychological or physical problems as a result of substance abuse.[2] The Committee has approximately 20 members.

The Committee follows a protocol formulated in approximately 1989. After receiving information that a physician may have a problem, the Committee evaluates the information to determine whether it merits further

---

[1]The facts about the Well-Being of Physicians Committee as well as its interview with Goodstein are primarily gleaned from the testimony given by Dr. Julian Gold, cochair of the committee, at the internal review hearing conducted at Goodstein's request following his suspension.

Hospital correctly points out that many of the statements in Goodstein's respondent's brief are either not supported by citations to the record or are directly contradicted by the record. Hospital asks us to strike those portions of the brief. We decline to do so and instead simply disregard the information presented which is unsupported by the record. (Cal. Rules of Court, rule 18(3); *Balesteri* v. *Holler* (1978) 87 Cal.App.3d 717, 720 [151 Cal.Rptr. 229].)

[2]Section 10.3 of article X (entitled Peer Review and Quality Management) of Hospital's General Rules and Regulations of the Medical Staff provides: *"To assure that both the physical health and mental health of members of the Medical Staff are at an acceptable level to render quality patient care, if a member's physical or mental health is in question, either the Department Chair or the Senior Vice President for Medical Care Services may request a medical or psychiatric evaluation for a member of the Medical Staff. Any such medical examination may include screening for substance abuse.* Such an evaluation shall be obtained from a Physician on an established panel, within a reasonable timeframe. The cost of such an evaluation shall not be the responsibility of the Staff member. Results of such an evaluation shall be provided to the Senior Vice President for Medical Care Services and the Department Chair. An action may or may not be taken as a result of such an evaluation depending upon the results. *If a Staff member refuses such an evaluation, he or she may be suspended by the Senior Vice President for Medical Care Services subject to a hearing under Article XIII of the Medical Staff Constitution."* (Italics added.)

consideration. The Committee rejects much of the information after evaluating it. If the information appears to warrant further investigation, the Committee will contact the physician and request a meeting. Circumstances warranting such a meeting include those in which the Committee has received comments about the physician from "enough different sources" or if there is an incident "of such magnitude that it's public information."

At the meeting, a small group of Committee members will explain its concern to the physician and determine if there is any basis for that concern. Usually, the group includes a psychiatrist, a substance abuse specialist, and an experienced member of the Committee. After meeting with the physician in question, the group attempts to reach a consensus about the situation. Its decision is based *solely* on the information gathered during the meeting with the physician, not on the information which triggered the inquiry in the first instance. Very often, the physician dispels any concerns and the matter ends. If, however, the Committee concludes there is a problem, it will ask the physician to undergo a psychiatric evaluation and testing for substance abuse. The Committee's goal is to intervene before any problem arises which could threaten patient care. In the prior seven to eight years, the Committee has requested approximately twelve other physicians to submit to a psychiatric exam. Assuming the physician agrees there is a problem, the Committee and the physician will enter into an agreement that the physician will undergo treatment and remain substance free. The physician will be monitored and, if the problem is corrected, the matter will be closed. A physician's failure to abide by the Committee's requests is grounds for suspension of staff privileges. (See fn. 2, *ante.*)

The Committee has a firm policy not to disclose to the physician the sources of information which first led it to investigate and meet with the physician. This policy has several bases. One is to protect the source(s) from retaliation from the physician because it is not uncommon for the source(s) to be in a position close to the physician. For that reason, the Committee likewise does not divulge the information given to it because disclosure of that information would often essentially disclose the source. The policy of nondisclosure is also based on the recognition that physicians are very adept at engaging in self-denial when first confronted and, as a result, attempt to deflect discussion of their potential problem by changing the focus of the inquiry from themselves to the sources of information. Lastly, the policy of nondisclosure helps to implement the principle that the Committee's decision is to be grounded upon what it learns from the interview with the physician as opposed to the antecedent information which prompted the

interview because it ensures the decisionmaking process focuses on the interview with the physician, not the information provided by the sources.[3]

*The Committee Meets With Dr. Goodstein*

In 1993, the Committee received information from four or five credible and unconnected sources about a problem with Goodstein. The Committee was also aware of an incident reported in a newspaper about an altercation between Goodstein and another physician at a national conference. After discussing all of this information, the Committee agreed the matter warranted further investigation and asked Goodstein if he would meet with it. Goodstein agreed.

The five members who met with Goodstein on June 11, 1993, included a psychiatrist (Dr. Davis) and a chemical dependency expert (Dr. Horowitz), each of whom had five years' experience with the Committee. There was also a doctor from Goodstein's department, plastic surgery. The five met for over an hour with Goodstein, explaining and asking questions about their concerns. In particular, they expressed their concern for his emotional state and "discussed some of the issues that related to that . . . ." Goodstein was generally cooperative in answering questions but at times became hostile. Because of his demeanor, the Committee could not rule out the possibility of

---

[3]In addition, section 21.2.3 of article XXI (entitled Medical Staff Member Files) of the Hospital's General Rules and Regulations of the Medical Staff provides: "The Physician Well-Being File is a strictly confidential file kept under lock and key in the Medical Staff Office. Individuals who have access to these files are the Chair of the Well-Being of Physicians Committee and the Senior Vice President for Medical Care Services; the Vice Chair of the Well-Being Committee or a designated member of the Well-Being of Physicians Committee; and the Chief of Staff. Information concerning matters of quality of patient care (but not a Staff member's impairment) shall be provided to the Senior Vice President for Medical Care Services and to the respective Departmental Reappointment, Appointment, Privileging, Proctoring and Peer Review Committee. Notwithstanding the foregoing, if the Staff member is the subject of a hearing under Article XIII of the Medical Staff Constitution, the applicable Well-Being file may be opened if the material contained in the file is relevant to the charges and there has been an 'incident,' as defined below. For the purposes of this Section, an 'incident' shall mean an act or omission of the Staff member that directly relates to patient care or the breach of the Staff member's contract for rehabilitation as made with the Well-Being of Physicians Committee. The determination as to whether the Well-Being file is relevant to the charges or whether there has been an incident shall be made by the Chair and Vice Chair of the Well-Being of Physicians Committee. Further, at the time any Staff member submits a completed Reappointment form, the Staff member's name shall automatically be forwarded to the Chair and Vice Chair of the Well-Being of Physicians Committee for them to determine if information in the Staff member's Well-Being file should be shared with the Chair of RAPPP Committee of the relevant Department. Specific information regarding any individual Physician's impairment shall not be provided by the Well-Being of Physicians Committee to any person except in compliance with the provisions of this Section and applicable law pertaining to the confidentiality of medical records. All Staff members are deemed to have specifically consented to the foregoing."

a substance abuse problem. When the issue of taking a urine test came up, Goodstein refused but volunteered the fact that the same request had been made to him by an investigator for the California Medical Board. (The Committee subsequently spoke with that investigator, Mark Gonzales, who told them Goodstein had refused his request for a urine test.) Goodstein told the Committee he did not feel "there was a problem as relates to his mental health." Goodstein indicated that he believed some of the allegations against him came from a former colleague with whom litigation appeared imminent. Goodstein asked the Committee for the sources of its information, suggesting that he would consider submitting to a urine test or a psychiatric evaluation if that data were disclosed. The Committee declined to disclose that information.

When the five members of the Committee subsequently met, they concluded, based on the information gained during its meeting with Goodstein, that there was a sufficient basis to request a psychiatric evaluation and random urine testing. They were "very concerned about Dr. Goodstein." The five presented this recommendation to the entire Committee which concurred. The Committee then sent Goodstein a letter requesting a psychiatric evaluation and random urine testing. Goodstein refused. After the Committee was unable to resolve the matter with Goodstein, Goodstein was informed that pursuant to Hospital's medical staff rules and regulations, he would be suspended. (See fn. 2, *ante.*) Goodstein still refused to cooperate.

In March 1994, Hospital suspended Goodstein's staff privileges.

*Goodstein Internally Contests His Suspension*

Pursuant to Hospital's rules, Goodstein requested and was granted a hearing to challenge his suspension. At the hearing, where he was represented by counsel, Goodstein did not contest that he refused to submit to a psychiatric examination or to provide a urine sample. Nor did Goodstein contest that his refusal was sufficient grounds for suspension. Instead, Goodstein took the position that there was no basis for the Committee to have met with him and that absent the Committee's disclosure of its sources, Goodstein was not required to submit to the Committee's requests. At this hearing, Goodstein asked for disclosure of the sources. Dr. Gold, the co-chair of the Committee, refused to provide that information.

Goodstein lost at all levels of internal hospital review. The last level, the appeal committee of the board of directors, found that Goodstein had

received a fair hearing and that substantial evidence supported the decision to suspend him.

## Trial Court Proceedings

Goodstein filed a petition for a writ of mandate in the superior court, seeking reinstatement of his staff privileges. Essentially, he urged that the Committee's refusal to "inform[] him of the nature of the charges against him or the identity of the individual or individuals making the charges" deprived him of "due process of law."

The trial court granted Goodstein's petition. It found that "[a] fair procedure was not applied" because the Committee, both in its meeting with Goodstein and at the Hospital's administrative hearing, refused to divulge its sources.

## Appellate Court Proceedings

Hospital appealed from the superior court's judgment and filed a writ petition requesting a stay of that portion of the judgment which would have permitted Goodstein to regain his medical staff privileges pending disposition of the appeal. Pursuant to Code of Civil Procedure section 1094.5, subdivision (h)(3), we issued an order staying the reinstatement order.

### DISCUSSION

 This appeal raises the issue of whether or not the Committee could meet with Goodstein, formulate an opinion about his potential substance abuse, and request that he take a urine exam and submit to psychiatric evaluation *without* revealing to him its initial source(s) of information. Goodstein contended, and the trial court agreed, that allowing the Committee to proceed in that manner violated the requirement of a fair procedure, thereby precluding Hospital's suspension of his staff privileges for his admitted refusal to submit to the two requests. Analogizing to principles of constitutional criminal procedure, Goodstein urges: "[W]hen they [the Committee] refused to identify those tipsters, the fruit of the poisoned tree doctrine came into play and destroyed the validity of their initial investigation of Goodstein, therefore their evaluations of Goodstein in the face-to-face meeting could not be used to punish Goodstein." This analysis is incorrect.

Because the dispositive issue on this appeal is the propriety of the policy forbidding disclosure of the sources of the Committee's information, we must determine whether the policy is "substantively irrational, unlawful or contrary to established public policy or procedurally unfair." (*Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 385 [146 Cal.Rptr. 892].) We cannot apply that test to the policy in a vacuum. Instead, we must apply it in the context of well-settled principles governing hospitals and physicians.

A physician's right to practice in a hospital is not absolute. It "must be balanced against other competing interests: the interests of members of the public in receiving quality medical care, and the duty of the hospital to its patients to provide competent staff physicians.[4] Consequently, disciplinary procedures involving physicians have developed primarily from a protective rather than a punitive purpose. [Citation.] The hospital has 'a direct and independent responsibility to its patients of insuring the competency of its medical staff and the quality of medical care provided . . . .' [Citation.] Hospitals must be able to establish high standards of professional work and to maintain those standards through careful selection and review of staff. And they are required to do so by both state and federal law. [Citations.]" (*Rhee* v. *El Camino Hospital Dist.* (1988) 201 Cal.App.3d 477, 489 [247 Cal.Rptr. 244].) A hospital carries out this task, in part, through a formally organized and self-governing medical staff which acts through peer review committees. (*Arnett* v. *Dal Cielo* (1996) 14 Cal.4th 4, 10 [56 Cal.Rptr.2d 706, 923 P.2d 1], and authorities cited therein.) The Committee is one such peer review committee.

In analyzing the actions of the Committee, we must bear in mind that "[s]ince the actions of a private institution are not necessarily those of the state, the controlling concept in such cases is fair procedure and not due process. Fair procedure rights apply when the organization involved is one affected with a public interest, such as a private hospital. [Citation.] [¶] The distinction between fair procedure and due process rights appears to be one of origin and not of the extent of protection afforded an individual; the essence of both rights is fairness. Adequate notice of charges and a reasonable opportunity to respond are basic to both sets of rights. [Citations.]" (*Applebaum* v. *Board of Directors* (1980) 104 Cal.App.3d 648, 657 [163 Cal.Rptr. 831].) " 'The common law requirement of a fair procedure does not

---

[4]It is well settled that a hospital may be liable to a patient for the negligence of one of its physician staff if the hospital's failure to ensure the competence of its staff through appropriate selection and review procedures creates an unreasonable risk of harm to its patients. (See, e.g., *Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332 [183 Cal.Rptr. 156].)

compel formal proceedings with all the embellishments of a court trial . . . nor adherence to a single mode of process. It may be satisfied by any one of a variety of procedures which afford a fair opportunity for [the physician] to present his position. . . .' " (*Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 829 [140 Cal.Rptr. 442, 567 P.2d 1162].) Furthermore, ". . . it must be emphasized that this is not a criminal setting, where the confrontation is between the state and the person facing sanctions. Here the rights of the patients to rely upon competent medical treatment are directly affected, and must always be kept in mind. An analogy between a surgeon and an airline pilot is not inapt; a hospital which closes its eyes to questionable competence and resolves all doubts in favor of the doctor does so at the peril of the public." (*Rhee* v. *El Camino Hospital Dist., supra,* 201 Cal.App.3d at p. 489.) Lastly, " ' "[j]udges are untrained and courts ill-equipped for hospital administration" ' " and therefore should not second-guess policies made rationally and in good faith unless the policy is clearly unlawful. (*Mateo-Woodburn* v. *Fresno Community Hospital & Medical Center* (1990) 221 Cal.App.3d 1169, 1185 [270 Cal.Rptr. 894].)

 Given these principles, we find that the policy of nondisclosure comports with the concept of fair procedure. For one thing, putting aside the fact that a physician is not similarly situated to a criminal defendant and therefore does not have a due process right to disclosure, Goodstein vastly overstates the role of the initial complainants. Those individuals merely trigger a review by the Committee of the physician. Many times the Committee finds no merit to the complaint and the matter goes no further. It is only if the Committee determines that there is a legitimate cause for concern does it request a meeting with the physician. At that meeting, the Committee outlines its concerns and gives the physician ample opportunity to respond. Once again, many times the physician's responses assuage the Committee's concerns and the matter goes no further. It is only if the Committee, which includes a psychiatrist and a specialist in substance abuse, concludes based upon its evaluation of the information gleaned during the meeting with the physician that there is cause for concern that psychiatric evaluation and drug testing are requested. No disciplinary action is taken until reliable information in the form of an independent psychiatric evaluation and a drug test is received. Hence, it is apparent that the information furnished by the initial complainants does *not* provide the basis for either the Committee's requests or any subsequent disciplinary action; instead, its requests and recommendations, if made, are based on the intervening and independent evaluation of the Committee and the information gained by the psychiatric examination and drug test(s). It therefore follows that the physician has little, if any,

cognizable need for the information which triggered the investigation so that the policy of nondisclosure does not offend the principle of fair procedure.[5]

Furthermore, legitimate concerns support the policy of nondisclosure. Because the initial complainant is often an individual closely associated with the physician, the individual is legitimately concerned about retaliation. Disclosure of that person's identity would affect the willingness of the person to disclose information about a physician's substance abuse problem which could be endangering patient safety. Protecting the identities of the complainants in order to encourage the free flow of information about such an important concern (patient safety) is proper and, under certain circumstances, is compelled by the right to privacy found in our state Constitution. (*Board of Trustees* v. *Superior Court* (1981) 119 Cal.App.3d 516, 527-533 [174 Cal.Rptr. 160].) Furthermore, the policy of nondisclosure furthers the goal of having the Committee make its determination based upon its meeting with and independent evaluation of the physician. Requiring the Committee to disclose the source(s) to the physician would simply deflect the inquiry from the pertinent question of whether, based upon the Committee's observations and evaluations, there is a danger to patient safety to the question of who said what to the Committee in the first instance.

The Hospital complied with the concept of fair procedure, the appropriate standard for the enforcement of a private hospital's rules. In all of the internal hearings conducted following Goodstein's suspension for failing to comply with the Committee's requests, he was given notice of the charges and opportunity to be heard. In fact, Goodstein concedes that he did not comply with the Committee's requests and that the internal administrative hearings he received after first being suspended were fair. Goodstein's sole attack in the trial court on Hospital's suspension of his staff privileges and his sole argument on this appeal to uphold the trial court's judgment is that the Committee was required to reveal its sources to him and that its failure to do so requires reversal of the suspension of his staff privileges. As we have explained, sound public policy considerations support the policy of nondisclosure. We, therefore, reverse the trial court's judgment directing reinstatement of Goodstein's staff privileges and direct the court to enter a judgment denying his petition.

---

[5]As stated above, principles of constitutional criminal procedure do not apply in this setting. Nonetheless, we do note that the role of the complainants in this fact pattern is essentially identical to the role of an informant who simply points the finger of suspicion at a person who has violated the law; due process does *not* require the state to disclose the identity of such an individual. (*People* v. *Wilks* (1978) 21 Cal.3d 460, 469 [146 Cal.Rptr. 364, 578 P.2d 1369]; *People* v. *McShann* (1958) 50 Cal.2d 802, 808 [330 P.2d 33].)

## DISPOSITION

The judgment is reversed and the trial court is directed to enter judgment denying Goodstein's petition for a writ of mandate. Appellant to recover costs on appeal. Pending finality of this opinion, the stay order of August 22, 1997, is to remain in effect.

Epstein, J., and Hastings, J., concurred.