[No. G014226. Fourth Dist., Div. Three. Jan. 31, 1996.]

FIROOZ R. OSKOOI, Plaintiff and Respondent, v.
FOUNTAIN VALLEY REGIONAL HOSPITAL AND MEDICAL
CENTER, Defendant and Appellant.

**COUNSEL**

Manatt, Phelps & Phillips, Robert E. Hinerfeld, Barry S. Landsberg and Terri D. Keville for Defendant and Appellant.

Dumas & Associates and Jonathan B. Crane for Plaintiff and Respondent.

OPINION

SONENSHINE, J.—Ophthalmologist Firooz Oskooi did not disclose his past hospital affiliations when he applied for staff privileges at Fountain Valley Regional Hospital and Medical Center (the Hospital). After the Hospital summarily suspended him for those omissions, he filed a petition in superior court to force the Hospital to set aside the suspension, but failed to take any further action until four years later. Despite the trial court's finding that Oskooi had no excuse for the delay, it denied the Hospital's motion to dismiss for lack of prosecution. Thereafter, it set aside Oskooi's suspension. The trial court erred on both counts.

I

Oskooi sought staff privileges at the Hospital in 1986. He completed the application, but in answering section 6, which asked for "all current and previous hospital affiliations," and section 13, which asked for "previous practice[s]," Oskooi omitted his previous affiliations with Hawaii and Illinois hospitals. In fact, despite warnings on the application that "any significant omission is cause for summary dismissal," Oskooi failed to mention those hospitals anywhere on the form.

Oskooi was granted provisional staff privileges in July but the Hospital summarily suspended him on July 30, 1987, alleging his "technical judgment [was] not up to the standards of the medical community," and he experienced "indecision [on] when to perform [certain other medical procedures]." After a hospital judicial review committee hearing on August 17, he was reinstated. His victory was short lived.

On October 1, Oskooi's privileges were again suspended, this time because of the application omissions. Oskooi exhausted his administrative remedies in January 1988, and on September 2, he filed the underlying petition for writ of mandate asking the court to set aside his suspension. The Hospital responded to the writ on September 20. Oskooi was evidently not in a hurry. Years passed until finally in 1992, Oskooi notified the Hospital he was ready to go forward. In response, the Hospital filed the underlying Code of Civil Procedure [1] sections 583.410 and 583.420 motions to dismiss.

At the August 28, 1992, hearing, Oskooi argued the delay in prosecution was excused because he had not had the money to proceed and he had been waiting for the outcome of two other cases to which the Hospital was a

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

party. The court, although unimpressed with Oskooi's excuses, denied the Hospital's motions without prejudice.[2]

In November, Oskooi finally requested a hearing date, which was set for January 8, 1993. The court granted Oskooi's writ, but his counsel was ordered to include a statement in the judgment indicating there was no reason the matter could not have been heard before September 2, 1989.[3] The Hospital's subsequent motion to vacate was denied.

## II

## REVIEWABILITY

■ Oskooi maintains the denial of a motion to dismiss without prejudice is not reviewable on appeal. He is wrong. While a denial of a dismissal motion is not *directly* appealable, it may be challenged either by a petition for writ of mandate or in an appeal after a final judgment. (*Paul E. Iacono Structural Engineer, Inc.* v. *Rizzo* (1984) 162 Cal.App.3d 803, 809 [208 Cal.Rptr. 787].)[4]

---

[2]The court made the following statements during the hearing: "[A] matter that has just been sitting for this long a time should just be dismissed"; "it's hard to imagine [Oskooi] couldn't work out some kind of a payment schedule"; "I think it's going to be difficult for [Oskooi] to rely on another case"; "to let this thing languish for four years, frankly, just doesn't make a whole lot of sense"; the Hospital "had every reason to believe [the matter had] gone by the wayside"; and "someone interested in redress just doesn't wait four years." The court ultimately denied the motion "with a great deal of reluctance" and warned Oskooi "you [had] better do something about this."

[3]The court hoped this finding would minimize Oskooi's damages, thus eliminating the Hospital's prejudice claim.

[4]Weil and Brown, California Practice Guide: Civil Procedure Before Trial (The Rutter Group 1995) paragraph 11:190, page 11-65 concludes *Reid* v. *Balter* (1993) 14 Cal.App.4th 1186 [18 Cal.Rptr.2d 287] holds a denial of a discretionary motion to dismiss is reviewable *only* by writ. But the Legislature in enacting section 906 determined a reviewing court "may review . . . any intermediate ruling . . . which substantially affects the rights of a party." A denial of a motion to dismiss is such a ruling. *Reid* therefore cannot be read to divest the trial court of its legislatively granted jurisdiction. (*Savage* v. *Smith* (1908) 154 Cal. 325 [97 P. 821].) Moreover, *Reid did not hold appellate review was unavailable.* Rather, it concluded *appellate relief was unjustified* based on the circumstances presented there. Specifically, the court pointed to the lack of prejudice to the appellant and the counterproductiveness of waiting until after a lengthy trial to seek review.

In justifying its first argument, *Reid* relied solely on *Waller* v. *TJD, Inc.* (1993) 12 Cal.App.4th 830 [16 Cal.Rptr.2d 38], a case involving an appeal from an adverse judgment after an unsuccessful summary judgment motion. The *Waller* court, citing article VI, section 13 of the California Constitution determined "a more favorable outcome, *at trial*" was a condition precedent to appellate relief. (12 Cal.App.4th at p. 833, original italics.)

But article VI, section 13 of the California Constitution contains no language mandating the conclusion that *only* error affecting a *trial outcome* is prejudicial. (If it did, all cases allowing

## Does Section 583.110 et seq. Apply to Mandamus Proceedings?

■ The next question to be considered is whether section 583.110 et seq. discretionary dismissal statutes are applicable to mandamus proceedings. One must first note the dismissal statutes do not apply to special proceedings unless incorporated by reference. (§ 583.120, subd. (a).) A petition for administrative mandamus is a special proceeding and the dismissal statutes are not incorporated therein. (*Binyon* v. *State of California* (1993) 17 Cal.App.4th 952, 954 [21 Cal.Rptr.2d 673].) But there is another consideration.

Section 583.120, subdivision (b) provides, "Notwithstanding subdivision (a), the court may, by rule or otherwise under inherent authority of the court, apply this chapter to a special proceeding . . . except to the extent such application would be inconsistent with the character of the special proceeding or the statute governing the special proceeding." The Law Revision Commission comment to section 583.120 provides guidance to understanding the legislative intent. Subdivision (b) permits application of the dismissal statutes to special proceedings unless such application would increase the already applicable time limits. (17 Cal. Law Revision Com. Rep. (June, 1984) pp. 905, 929.) In other words, the general dismissal statutes apply to special proceedings unless to do so would permit rather than prevent delay.

Dismissal statutes are inapt to a will contest because a probate court possesses inherent power to dismiss for failure to prosecute. (*Horney* v. *Superior Court* (1948) 83 Cal.App.2d 262, 270 [188 P.2d 552].) And these statutes do not apply to mechanic's lien foreclosures because Civil Code

---

default relief after an adverse judgment would be in contravention of the Constitution.) Indeed, the phrase "examination of the entire cause" found in article VI, section 13 suggests review is to be made of all the matters in a case, including those independent of trial on the merits.

Second, there is a difference between the erroneous denial of a summary judgment motion (or demurrer, or nonsuit, see *Waller* v. *TJD, Inc., supra*, 12 Cal.App.4th at pp. 833-834) and error or abuse in ruling on procedural motions, such as relief from default. The former are, in effect, self-correcting by virtue of the trial process itself. After all, if a plaintiff does not have enough evidence to establish a cause of action (i.e., vulnerable to demurrer or nonsuit) or triable issues of fact (i.e., vulnerable to summary judgment), that will either be revealed in trial or it will become clear that in all justice the demurrer, nonsuit or summary judgment motion should never have been denied *in the first place*. The same cannot be said for procedurally grounded motions not bearing on the essential merits of the case. Thus, regardless of the soundness of *Waller*, it is distinguishable from *Reid*.

*Reid's* alternative rationale that it is "counterproductive" to wait until after a case has been tried to request review of a discretionary dismissal motion is simply laches by another name and unpersuasive because as explained, intermediate orders affecting the rights of a party are subject to appellate review. (§ 906; *In re Matthew C.* (1993) 6 Cal.4th 386, 394-395 [24 Cal.Rptr.2d 765, 862 P.2d 765].)

section 3147 provides a two-year dismissal statute for such actions. However, as recognized in *Binyon* v. *State of California, supra,* 17 Cal.App.4th 952, 956, because "[t]here is no specific statute that permits dismissal of an administrative mandamus proceeding for failure to prosecute[,] . . . it would not be inconsistent to apply the general dismissal statute to [mandamus] proceedings." Moreover, as noted by the trial court here, delay in prosecuting an administrative mandamus action is particularly egregious because of the inherent claim of irreparable harm.[5]

Oskooi argues it is nevertheless inconsistent to apply the dismissal statutes to mandamus actions because staleness of evidence is not an issue in a closed-record administrative hearing review. But in *Binyon* the court rejected the same argument, noting the record may in fact be augmented with new evidence in certain situations. In any event, prevention of prejudice to the defendant is not the statute's sole purpose; it is also intended to " ' "expedite the administration of justice by compelling every person who files an action to prosecute it with promptness and diligence." . . .' " (*Binyon* v. *State of California, supra,* 17 Cal.App.4th 952, 956.)

A party "cannot file a petition for writ of administrative mandamus, then sit back for years without taking the slightest action to have it determined until it suits his [or her] convenience, and . . . expect that the court must hear [the] petition on the merits despite his [or her] lack of diligence." (*Binyon* v. *State of California, supra,* 17 Cal.App.4th at p. 957.) *Binyon* is compelling and one must thus conclude section 583.110 et seq. applies to mandamus proceedings.

### Is Dismissal Mandatory?

█ Next to be considered is under what conditions, if any, dismissal is mandatory. The controlling statutes provide, inter alia, the trial court has discretion to "dismiss an action for delay in prosecution" when the action is not brought to trial within the specified time. (§§ 583.410, 583.420, subd. (a)(2)(A) & (a)(2)(B).)

The trial court possesses almost unfettered discretion in deciding factual disputes and whether the proffered reasons justify the delay. But this is a different question: does the trial court retain discretion when there are neither factual disputes nor any reasons justifying the delay?

[5]The court noted, "[O]ne of the purposes of a writ of mandate is that you get an answer fairly soon. Most people complain that they can't get a hearing soon enough, . . . they want something immediately. And they file the petition and they immediately . . . order the record and they try to get everything on calendar as soon as possible, but to let this thing languish for four years, frankly, just doesn't make a whole lot of sense from [Oskooi's] point of view."

Our Supreme Court in *Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 563 [86 Cal.Rptr. 65, 468 P.2d 193], expressly disapproved prior cases which held a motion to dismiss *must* be granted unless opposed by an "adequate showing of diligence or excuse for delay."[6] The *Denham* court concluded: " ' "It is only when there is *an entire absence of any showing constituting good cause* presented in the Superior Court upon the hearing of the motion to dismiss that a writ of mandate to compel the dismissal of the action may properly issue." ' " (*Id.* at p. 564, italics added.)

Several courts have interpreted *Denham* as permitting the trial court discretion even in the absence of any showing of excusable delay. (*Williams* v. *Los Angeles Unified School Dist.* (1994) 23 Cal.App.4th 84, 94, fn. 4 [28 Cal.Rptr.2d 219] ["In *Denham*, the court held that the trial court always had discretion to deny a motion to dismiss, even when the plaintiff failed to present any excuse for its inaction."]; *Scarzella* v. *DeMers* (1993) 17 Cal.App.4th 1762, 1769, fn. 4 [22 Cal.Rptr.2d 329] [*Denham* disapproved of language which suggested "absent an affirmative showing of excuse by the plaintiff the trial court would be *required* to grant dismissal . . . ."]; *Ladd* v. *Dart Equipment Corp.* (1991) 230 Cal.App.3d 1088, 1105 [281 Cal.Rptr. 813] ["No Supreme Court case has disapproved of the *Denham* rule that the absence of diligence does not necessarily require dismissal . . . ."]; *United Farm Workers National Union* v. *International Brotherhood of Teamsters* (1978) 87 Cal.App.3d 225, 235 [150 Cal.Rptr. 761] ["*Denham* holds that when there is an entire absence of a showing of good cause the trial court *may* (i.e., has discretion to) dismiss the action."].)

Those cases misinterpret *Denham* which, while expanding trial court discretion, did not render it unlimited. Prior to *Denham*, a motion to dismiss was mandated when a party failed to make an *adequate* showing of diligence or excuse. *Denham* changed the standard permitting trial court discretion unless there is an absence of *any* showing constituting good cause.

In *Woolfson* v. *Personal Travel Service, Inc.* (1971) 3 Cal.3d 909 [92 Cal.Rptr. 286, 479 P.2d 646], the Supreme Court restated this conclusion. "In *Denham* . . . this court by unanimous opinions . . . held that dismissal under section 583, subdivision (a) . . . is *mandatory* 'only when there is an entire absence of any showing constituting good cause.' " (*Id.* at p. 912,

---

[6]*Denham* disapproved the following cases: *Carnation Co.* v. *Superior Court* (1969) 1 Cal.App.3d 891, 895 [82 Cal.Rptr. 98]; *Paul W. Speer, Inc.* v. *Superior Court* (1969) 272 Cal.App.2d 32, 36, 37 [77 Cal.Rptr. 152]; *Market-Front Co.* v. *Superior Court* (1969) 271 Cal.App.2d 505, 506-507 [76 Cal.Rptr. 526]; *City of Los Angeles* v. *Superior Court* (1969) 271 Cal.App.2d 292, 298 [76 Cal.Rptr. 256]; *Black Bros. Co.* v. *Superior Court* (1968) 265 Cal.App.2d 501, 507 [71 Cal.Rptr. 344]; and *Breckenridge* v. *Mason* (1967) 256 Cal.App.2d 121 [64 Cal.Rptr. 201].

italics added.) Again, in *Dunsmuir Masonic Temple* v. *Superior Court* (1970) 12 Cal.App.3d 17, 21 [90 Cal.Rptr. 405], the court explained that although plaintiff has no burden to show good cause for delay, plaintiff still has an obligation to make some showing upon which the court can exercise its discretion. The difference is defining "an *adequate* showing and *any* showing." (Original italics.) Recently, in *Howard* v. *Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 440-441 [41 Cal.Rptr.2d 362, 895 P.2d 469], the Supreme Court reiterated this principle: In order to avoid dismissal, a plaintiff must generally make " 'some showing of excusable delay' . . . ."

Several Courts of Appeal have correctly followed the *Denham* rule. (*Kunzler* v. *Karde* (1980) 109 Cal.App.3d 683, 689 [167 Cal.Rptr. 425] ["[T]he concept that a trial court, absent any evidence of good cause for protracted delays, may deny a motion to dismiss is not to be found in *Denham* and is faulty."]; *Lopez* v. *Larson* (1979) 91 Cal.App.3d 383, 398 [153 Cal.Rptr. 912] ["[I]t has always been true and remains true that if, in the exercise of its discretion, the trial court determines that insufficient good cause or justification has been shown for protracted delay, it may, and properly should, grant the motion to dismiss."]; *City of Los Angeles* v. *Gleneagle Dev. Co.* (1976) 62 Cal.App.3d 543, 561 [133 Cal.Rptr. 212] ["Dismissal is only mandated when there is an entire absence of any showing of good cause for delay."].) These cases correctly conclude a trial court must grant a motion to dismiss when there is no showing of excusable delay.

### DOES THIS RECORD ESTABLISH ANY SHOWING CONSTITUTING GOOD CAUSE?

■ Oskooi argues the suspension caused him to be without the necessary funds to pursue his action. There is no authority which "gives even lip service to the concept that lack of economic resources is sufficient excuse for failure to prosecute with diligence." (*Rodde* v. *Trousdale Constr. Co.* (1969) 276 Cal.App.2d 419, 422 [80 Cal.Rptr. 774].) As noted in *American Western Banker* v. *Price Waterhouse* (1993) 12 Cal.App.4th 39, 57 [14 Cal.Rptr.2d 916], no case "supports a conclusion that a litigant may unilaterally put the case in abeyance to meet its own financial needs.[7] Moreover,

---

[7]Oskooi argues service of process cases are inapt authority for discretionary dismissal cases. He is wrong. The legislative intent underlying both is the same: avoidance of prejudice to a defendant and " 'expedit[ing] the administration of justice by compelling every person who files an action to prosecute it with promptness and diligence.' " (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 332 [216 Cal.Rptr. 718, 703 P.2d 58].)

California Rules of Court, rule 373(e) does not include a plaintiff's financial condition as a factor to be considered by the trial court.[8]

Even if "we accept the premise, arguendo, that poverty may be considered as one circumstance in the totality of facts presented" (*Lowe* v. *Thomas* (1970) 11 Cal.App.3d 867, 870-871 [90 Cal.Rptr. 202]), the result is the same: Poverty does not justify the delay. The administrative record was a mere 32 pages containing only a few exhibits. No discovery was necessary. Oskooi had only to notice a motion and hearing on his petition. And he was no pauper. The record reveals he was averaging a net income of $35,000 a year as an ophthalmologist. As the trial court commented, "[I]t's hard to imagine [Oskooi and counsel] couldn't work out some kind of payment schedule. . . . $35,000 may not be a fortune, but it's certainly enough to . . . make some payments." From this record one can only surmise the delay was caused not by Oskooi's financial hardship, but "instead, that, [he] 'refused' and 'failed' to make the necessary financial arrangements . . . ." (*Rodde* v. *Trousdale Constr. Co.*, *supra*, 276 Cal.App.2d at p. 422.)

Oskooi also argues the delay in prosecution was justified because he was awaiting the outcome of *Ledergerber* v. *Fountain Valley Regional Hospital & Medical Center* (Feb. 22, 1995) G013843 (nonpub. opn.) and *Rosenblit* v. *Superior Court* (1991) 231 Cal.App.3d 1434 [282 Cal.Rptr. 819]. His argument is unpersuasive because the issues raised there are neither relevant to nor dispositive of the matters now under consideration. (See, e.g., *Putnam* v. *Clague* (1992) 3 Cal.App.4th 542, 560 [5 Cal.Rptr.2d 25]; *County of Los Angeles* v. *Superior Court* (1988) 203 Cal.App.3d 1205 [250 Cal.Rptr. 481].) Both cases considered substantive questions regarding a doctor's clinical judgment and treatment methods. While most of the cited authorities considered fairness, the issues were fact specific to those cases.

It thus appears this excuse was conceived in hindsight. Oskooi fails to establish he even knew about *Rosenblit* until *after* it was published. And

---

[8]California Rules of Court, rule 373(e) states: "In ruling on the motion [to dismiss] the court shall consider all matters relevant to a proper determination of the motion, including the court's file in the case and the affidavits and declarations and supporting data submitted by the parties and, where applicable, the availability of the moving party and other essential parties for service of process; the diligence in seeking to effect service of process; the extent to which the parties engaged in any settlement negotiations or discussions; the diligence of the parties in pursuing discovery or other pretrial proceedings, including any extraordinary relief sought by either party; the nature and complexity of the case; the law applicable to the case, including the pendency of other litigation under a common set of facts or determinative of the legal or factual issues in the case; the nature of any extensions of time or other delay attributable to either party; the condition of the court's calendar and the availability of an earlier trial date if the matter was ready for trial; whether the interests of justice are best served by dismissal or trial of the case; and any other fact or circumstance relevant to a fair determination of the issue. The court shall be guided by the policies set forth in § 583.130 . . . ."

Oskooi's reliance on *Ledergerber* is no more compelling. There, the plaintiff, represented by the same counsel who represented Oskooi, did not file his writ of mandate petition until more than a year after that doctor's suspension, and then almost four years elapsed before he asked for a hearing. Oskooi cannot expect to excuse this delay by claiming he was waiting for the outcome of another case his counsel also delayed.

### III

Oskooi fares no better even if the merits of the writ are considered. Clearly substantial evidence supported the Hospital's decision to suspend his staff privileges.[9]

The trial court granted Oskooi's writ and set aside his suspension, finding the Hospital abused its discretion "within the meaning of . . . [section] 1094.5." Abuse of discretion within the meaning of section 1094.5 occurs when a hospital proceeds in an unlawful manner, its findings are unsupported by the evidence, or its decision is unsupported by the findings. (§ 1094.5, subds. (b) & (d).)

Because appellant is a *private* hospital, the trial court reviews the administrative record to determine whether the Hospital's findings are "supported by substantial evidence in the light of the whole record." (§ 1094.5, subd. (d); see also *Unterthiner* v. *Desert Hospital Dist.* (1983) 33 Cal.3d 285, 297-298, fn. 6 [188 Cal.Rptr. 590, 656 P.2d 554].)[10] The findings must be affirmed unless they are "so lacking in evidentiary support as to render them unreasonable." (*Gaenslen* v. *Board of Directors* (1985) 185 Cal.App.3d 563, 572 [232 Cal.Rptr. 239]; *Cipriotti* v. *Board of Directors* (1983) 147 Cal.App.3d 144, 155 [196 Cal.Rptr. 367]). Our review of findings is based on the same standard. (*Bonner* v. *Sisters of Providence Corp.* (1987) 194 Cal.App.3d 437, 444 [239 Cal.Rptr. 530]; *Gaenslen* v. *Board of Directors*, *supra*, 185 Cal.App.3d at pp. 572-573.)

The court concluded, "There was definitely substantial evidence to support the fact that the information was omitted" and noted the form

---

[9]The author agrees with the conclusions reached in Justice Sills's concurring opinion.

[10]In *Unterthiner* v. *Desert Hospital Dist.*, *supra*, 33 Cal.3d 285, the doctor failed to list relevant information in response to two application questions. One of those questions was almost identical to the question Oskooi failed to answer. The question asked the doctor to list all current and previous hospital affiliations, starting with the most current. (*Id.* at p. 289.)

warned of the consequences of such omissions. The court nevertheless found the suspension was inconsistent with the Hospital's bylaws standards for summary dismissal.

As the Hospital explains, however, this is a distinction without a difference. Oskooi was told from the beginning that he was being suspended because of the application omissions. Moreover, the result is the same no matter whether the application or bylaws govern. The application warned Oskooi "any significant omission is cause for summary dismissal." The Hospital's bylaws provide in part: "The applicant shall have the burden of producing adequate information for a proper evaluation of his competence, character, ethics and other qualifications, and of resolving any doubts about such qualifications. He shall have the burden of providing evidence that all the statements made and information given on the application are factual and true."

The issues to be resolved therefore are whether Oskooi's omissions justified his dismissal and whether the proceedings were in any way unlawful. The answers are yes and no.

Oskooi argues his suspension was merely a ruse because the Hospital had previously failed to remove him. Stated another way, he argues the Hospital should be estopped from pursuing this matter because the application contained enough information to put it on notice (i.e., he indicated he had practiced in Illinois and Hawaii). Moreover, even though the Hospital discovered the omissions during the time of the first suspension, it waited to proceed until *after* those proceedings were concluded. He is wrong.

It was Oskooi's obligation to provide the Hospital with the requested information. The Hospital had no duty to search for it, but once it was put on notice, it had a continuing duty to evaluate its physicians for public safety. (See *Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332, 346 [183 Cal.Rptr. 156].) Its reinstatement of Oskooi after his first suspension did not relieve it of this duty. And, the Hospital was under no compulsion to act within a particular time; in fact, there was no reason to suspend Oskooi because of the omission if he was going to be suspended in any event.

Oskooi fares no better with his other arguments the omissions were irrelevant because they did not directly relate to his medical abilities and the record fails to establish the necessity for a complete list of past affiliations. The "obvious purpose [of the required information] was to obtain a basis for determining whether a grant of privileges would [adversely affect patient care]." (*Unterthiner* v. *Desert Hospital Dist.*, *supra*, 33 Cal.3d 285, 299; see

also *Lapidot* v. *Memorial Medical Center* (1986), 144 Ill.App.3d 141 [98 Ill.Dec. 716, 494 N.E.2d 838].) It was necessary to know of *all* of Oskooi's past affiliations to be able to assess his qualifications.

Oskooi's reliance on *Rosenblit* is misplaced because it is factually distinguishable. There, another panel of this court concluded the hearing was unfair because of the "cumulative impact of the manner in which Hospital initiated its proceedings, responded to [the doctor's] repeated requests for specificity [of the charges], and ultimately rendered judgment on his professional competency . . . ." (*Rosenblit* v. *Superior Court, supra*, 231 Cal.App.3d 1434, 1445.) Although the doctor was suspended for medical incompetence, the hospital, despite repeated requests, failed to provide him with the specific charges. And then it upheld the suspension because the doctor was unable to establish the decision was unreasonable.

Here, Oskooi was suspended for omitting information from his application. He was notified exactly why he was suspended and was given a full and fair opportunity to respond and to present a defense. Nothing more is necessary. (*Miller* v. *National Medical Hospital* (1981) 124 Cal.App.3d 81, 90-91 [177 Cal.Rptr. 119].)[11]

## IV

The matter is remanded to the trial court to vacate its judgment setting aside Oskooi's suspension and to enter a new judgment denying his petition. The Hospital shall receive its costs on appeal.

**SILLS, P. J.,** Concurring.— ▮▮ Instead of analyzing this case on its procedural aspects, I would confine our decision to the substantive issue before us and reverse on the merits. The hospital clearly had substantial evidence to summarily suspend Dr. Oskooi.

Let us start by asking a basic question: how in the world did the judiciary ever get into the business of Monday morning quarterbacking the decisions of private hospitals about staff doctors? The answer is laid out in two

---

[11]Oskooi raised other issues below which he does not raise here. He claimed the Hospital's hearings were unfair because: (1) the hearing officer limited the hearing to the omissions; (2) the hearing panel was influenced by the Hospital's chief of staff acting as the prosecutor; and (3) the hearing officer and panel were different than those who reviewed Oskooi's first suspension.

The hearing officer correctly limited the issue because Oskooi's suspension was based on Oskooi's omissions, and not on the prior suspension. And although the chief of staff presented the case, he did not participate in the ultimate decision; nothing in the record indicates he unfairly influenced the panel. Moreover, the second panel was chosen in an unbiased and fair manner.

footnotes in a California Supreme Court case, *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541 [116 Cal.Rptr. 245, 526 P.2d 253] (*Pinsker II*).[1] In footnotes 7 and 8 on page 550, Justice Tobriner explained that courts have imposed a right to "fair procedure" in the membership decisions of certain private associations, such as professional associations and labor unions, since late Victorian times.

The initial theory was that these groups enjoyed monopoly power over the right of individuals to practice their trade or profession.[2] By 1977, however, the Supreme Court thought it enough that association membership merely affect "an important economic interest." (*Ezekial* v. *Winkley* (1977) 20 Cal.3d 267, 277 [142 Cal.Rptr. 418, 572 P.2d 32] ["[T]he application of the common law rule does not depend on the existence of 'monopoly' power . . . . The judicial inquiry, rather, has consistently been focused on the practical power of the entity in question to affect substantially an important economic interest."].) Thus the California fair procedure cases began with a labor union's expulsion of a tailor who worked during a strike (*Otto* v. *Tailors' P. & B. Union* (1888) 75 Cal. 308 [17 P. 217]), progressed to Black shipyard workers seeking membership in a labor union where there was a closed shop (*James* v. *Marinship Corp.*, *supra*, 25 Cal.2d 721), and eventually found their way to an orthodontist seeking membership in a specialist medical society (*Pinsker I*, *supra*, 1 Cal.3d 160.)

It was not until 1975, however, that this common law right of fair procedure was extended to applications for staff privileges in a hospital. (*Ascherman* v. *Saint Francis Memorial Hosp.* (1975) 45 Cal.App.3d 507 [119 Cal.Rptr. 507].) The theory was that the hospital enjoyed control over the physician's ability to "fully practice" his or her profession. (*Id.* at p. 511.) The court reasoned the "mere existence of other hospitals" was not "a

---

[1]*Pinsker I* was *Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160 [81 Cal.Rptr. 623, 460 P.2d 495].

[2]In less than three paragraphs on pages 551 through 552 of *Pinsker II*, *supra*, 12 Cal.3d there are no less than four references to monopolies: "Because of their monopolistic power in a given field of employment" (referring to "labor unions or professional and trade associations"); "Where a union has . . . attained a monopoly" (quoting from *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900]); the "underlying rationale of *Marinship*" was "a virtual monopoly over the use of local hospital facilities" (describing the way *Falcone* v. *Middlesex County Medical Society* (1961) 34 N. J. 582 [170 A.2d 791, 800, 89 A.L.R.2d 952], relied on *Marinship*); and the medical associations there "still wielded monopoly power and affected sufficiently economic and professional concerns so as to clothe the societies with a 'public interest' " (describing the rationale in *Pinsker I*).

sufficient safety valve to prevent deprivation of substantial economic advantage with the advent of comprehensive health planning." (*Ibid.*)[3]

When *Ascherman* was decided, no published decision had held that a *hospital* might be liable for the negligent *selection* of physicians on whom it conferred staff privileges. Nor did *Ascherman* discuss the possibility, which is, at the very least, counterintuitive to the monopoly-economic interest rationale. After all, if a labor union *must* accept a worker into its fold, it hardly seems fair to hold the labor union liable for the torts of the worker *because* of that admission!

But in 1982 *Elam* v. *College Park Hospital* (1982) 132 Cal.App.3d 332 [183 Cal.Rptr. 156] held that a hospital *could* be liable for the negligence of a staff physician. "As a general principle," the court intoned, "a hospital's failure to insure the competence of its medical staff through careful selection and review creates an unreasonable risk of harm to its patients." (*Id.* at p. 341.) Under the doctrine of "corporate negligence," a hospital could now be held liable to a patient for the negligence of doctors with staff privileges. "[W]e hold a hospital is accountable for negligently screening the competency of its medical staff to insure the adequacy of medical care rendered to patients at its facility." (*Id.* at p. 346.)

*Elam* reached the Court of Appeal on a summary judgment in favor of the hospital. The *Elam* court reversed the summary judgment because there was a triable issue of fact as to whether a hospital should have conducted an investigation through its peer review committee of a certain physician upon receiving notice of a prior malpractice claim. (132 Cal.App.3d at p. 348.)

It never dawned on the *Elam* court that it was placing hospitals in a bind. Case law had already established that hospitals did not have the freedom to exclude physicians from staff privileges without having some good reason; now *Elam* was holding that hospitals could be liable for *not* excluding potentially negligent physicians. Indeed, a sentence in the opinion suggests that the *Elam* court was under the misimpression that hospitals have unfettered discretion in whom they allow staff privileges: "[T]he hospital is in the best position to evaluate the competence of physicians it, *in its discretion*, allows to perform surgery and to practice within its premises . . . ." (132 Cal.App.3d at p. 345, italics added.)

As two law review commentators were quick to notice, the *Elam* decision subjected hospitals to competing and contradictory objectives. "The hospital

---

[3]The court did not explain what it meant by "comprehensive health planning." The *Ascherman* decision was handed down before health maintenance organizations (HMO) became widespread. Whether the current trend toward shorter hospital stays and surgical treatment on an outpatient basis undercuts *Ascherman*'s rationale is a matter which may be left for another day.

may indeed find itself between the proverbial 'rock and a hard place'—being sued by the physician for expelling him from the medical staff or being sued by his patient for not expelling him, or both." (Loveridge & Kimball, *Hospital Corporate Negligence Comes to California: Questions in the Wake of Elam v. College Park Hospital* (1983) 14 Pacific. L.J. 803, 813.)

I do not suggest that the two competing objectives of fair procedure and protection of patients from staff physician negligence are mutually exclusive in the strictest logical sense. The two ideas can be reconciled; it is possible to treat physicians fairly while still excluding the bad eggs.

Reconciling the two objectives, however, puts a premium on a physician's honest disclosure of past affiliations. The application for staff privileges isn't just some routine bit of paperwork. For better or worse, the case law has made it one of the most critical functions in hospital management.

We must remember the natural relationship between a doctor's prior record of patient care and the likelihood of successful future care. Prior hospital affiliations are not unreasonable predictors on that score. For example, a surgeon who failed to disclose a three-year hospital affiliation where all his or her patients died would be nothing less than a malpractice time bomb waiting to go off in the immediate, but indefinite future.

But unless hospitals are to be saddled with an unreasonable information-gathering requirement—forced to scrutinize prospective staff physicians like the CIA performing a security clearance—it is absolutely vital that the applying physician be absolutely truthful in his or her application.[4] Hospitals exist to help the sick and injured; they are not detective agencies.[5] They

---

[4]One of the themes of Dr. Oskooi's position is that the hospital could have obtained information from various medical associations, so what was the harm in not listing the hospitals? But because of the bind which the cases have put hospitals in, the burden should be on the applying physician to help hospitals minimize their cost of information gathering.

[5]The importance of candor on the part of the applying hospital staff physician has been underscored by the Legislature in another context. Back in 1967, the Court of Appeal in *Kenney v. Superior Court* (1967) 255 Cal.App.2d 106 [63 Cal.Rptr. 84] had allowed a plaintiff who was suing a doctor for malpractice (but not suing the hospital where the malpractice was allegedly committed) to obtain the hospital's staff records on the doctor. The Legislature quickly rebuffed the decision by enacting Evidence Code section 1157, which exempted hospital staff records from pretrial discovery. As our Supreme Court recently explained in discussing the statute: " 'Committee members and those providing information to the committee must be able to operate without fear of reprisal. Similarly, *it is essential that doctors seeking hospital privileges disclose all pertinent information to the committee.*" (*Alexander v. Superior Court, supra,* 5 Cal.4th 1218, 1227, quoting (with specific agreement) *Cruger v. Love* (Fla. 1992) 599 So.2d 111, 114.) See also *Brown v. Superior Court* (1985) 168 Cal.App.3d 489, 501 [214 Cal.Rptr. 266]: "The Legislature intended through section 1157 to

should have the widest possible discretion in decisions affecting physician staff privileges.[6]

There is no dispute in the present case that Dr. Oskooi did not disclose hospital affiliations for a lengthy duration of time. And there is no doubt that falsehood on an application for hospital staff privileges is good cause not to grant staff privileges to a doctor in the first place. (See *Unterthiner* v. *Desert Hospital Dist.* (1983) 33 Cal.3d 285, 299 [188 Cal.Rptr. 590, 656 P.2d 554].) The dissent, however, has concluded that because Dr. Oskooi was *suspended*, and the hospital did not mention omissions in its bylaws as a ground for suspension, that substantial evidence did not support the hospital's action. I cannot agree.

Dr. Oskooi was clearly and plainly warned in the application itself that any significant omission was cause for summary dismissal. The difference between a suspension pursuant to the bylaws and a dismissal pursuant to the application form is an academic, technical distinction far beyond the right to rudimentary fair procedure created by the case law. Dr. Oskooi was only entitled to *"rudimentary* procedural and substantive fairness." (*Ezekial* v. *Winkley, supra,* 20 Cal.3d at p. 278.)

The essential elements of this "rudimentary" fair procedure are (1) notification of "the reason for the proposed rejection" and (2) "a fair opportunity to defend." (See *Pinsker II, supra,* 12 Cal.3d 541, 555.) Dr. Oskooi certainly had these. He was given fair notice that the hospital wanted to suspend him because he omitted previous hospital affiliations on his application, and a hearing on that point—complete with hearing officer and court reporter. That hearing has now been the subject of extensive litigation in the trial court and now this court. As with much of life in late 20th century America, there is so much due process in this case that one cannot help tripping on it.[7]

What about the claim that Dr. Oskooi was not treated fairly because the letter suspending him referred him to the possibility of a hearing "as

encourage full and free discussions in the hospital committees in order to foster health care evaluation and improvement."

[6]In this regard, Justice Kane's remarks in his dissent in *Ascherman* have proved prophetic: "At a time when the standards of professional conduct and service are subject to aggressive consumer assault and when hospitals and physicians are exposed to increasing horizons of liability—often predicated upon principles of vicarious or imputed liability—*courts should not unduly interfere with the legitimate and ostensible good-faith efforts of . . . hospitals and physicians to protect themselves.*" (*Ascherman* v. *Saint Francis Memorial Hosp., supra,* 45 Cal.App.3d 507, 516 (dis. opn. of Kane, J.), italics added.)

[7]Indeed, when one examines the record before the trial court judge as well as that before the hospital's own administrative hearing officer, it shows how much the imposition of cumbersome legal procedures can obstruct simple common sense. One of the documents presented to the trial court was an internal memo revealing, from sources who had been promised anonymity, that early in his career in Illinois there were complaints that Dr. Oskooi,

provided in Article VII, part B" of the hospital's bylaws, and—guess what—when you look up article VII, part B, you only find a threat to patient care or institutional management as grounds for a suspension?

The application form stated that any significant omission of information was grounds for summary *dismissal*. A dismissal is worse than a suspension. In the context of this case, the fact that a physician can be dismissed for omitting information on an application while the bylaws provide that a physician can be suspended for threat to patient care or institutional management (and are silent about application omissions) is a minor discrepancy, not a denial of fair procedure. (See *Rhee* v. *El Camino Hospital Dist.* (1988) 201 Cal.App.3d 477, 497 [247 Cal.Rptr. 244] [violations of hospital bylaws must result in "unfairness, in some way depriving the physician of adequate notice or an opportunity to be heard before impartial judges" to establish denial of due process].) The hospital's letter telling Dr. Oskooi that he could request a hearing "as provided in Article VII, part B" of the bylaws was at most a technical goof—a classic case of harmless error. The letter still clearly gave him notice that the reason for the hospital's action was the omissions from the application. And, as the transcript shows, Dr. Oskooi had every opportunity to rebut the charge that he omitted vital information from his application. He was able, for example, to offer the explanation that a clerk had excused him from the need to attach further information.

I thus agree with Justice Sonenshine's opinion that the judgment in this case must be reversed, with the hospital to receive its costs. It is enough that the judgment be reversed because it erroneously holds the hospital did not have substantial evidence to suspend Dr. Oskooi.

**CROSBY, J.,** Dissenting.—" 'I'm very brave generally . . . only to-day I happen to have a headache.' "[1] Do I ever, having found myself trapped between two opinions that need a case. But I cannot subscribe to the analysis employed by either of my colleagues and simply accept that this panel has agreed to disagree. In that vein, I offer the following.

---

an eye doctor, was giving vaginal and rectal exams to his female patients. Even though the memo also mentioned that the practice was discontinued after he was visited by a delegation of fellow ophthalmologists, one can still imagine how Dr. Oskooi's colleagues at Fountain Valley Regional Hospital reacted to the information. Yet, probably because hospital personnel decisions have been turned into the equivalent of civil service hearings with every "i" needing to be dotted and "t" needing to be crossed, that information was not aired at the hospital hearing, where Dr. Oskooi might have had the chance to tell his side of the story. There are times when a surfeit of due process gets in the way of justice.

[1]Carroll, Alice's Adventure in Wonderland & Through the Looking-Glass (Bantam Books 1981) page 151.

I

Fountain Valley Regional Hospital and Medical Center (FVRHMC or the hospital) first challenges the judgment on procedural grounds.[2] It contends the superior court abused its discretion in refusing to dismiss Oskooi's petition for delay in prosecution. While this is precisely the argument a party would make when seeking a pretrial writ (see, e.g., *Denham* v. *Superior Court* (1970) 2 Cal.3d 557 [86 Cal.Rptr. 65, 468 P.2d 193]; *Martindale* v. *Superior Court* (1970) 2 Cal.3d 568 [86 Cal.Rptr. 71, 468 P.2d 199]), it has little relevance at this stage: the California Constitution precludes this court from reversing a *judgment* "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) That little problem, virtually ignored by the hospital and the lead opinion, is nevertheless one that must be addressed.

As mentioned, Oskooi's summary suspension and administrative hearing occurred in 1987. The hospital's final decision was rendered in early 1988, and Oskooi's petition for writ of mandate was filed September 2, 1988. The court did not hold a hearing on the petition's merits until January 8, 1993, however. In the interim, the defense lost a motion for a discretionary dismissal based on Oskooi's unexcused delay in prosecution. (Code Civ. Proc., §§ 583.410, 583.420.)

FVRHMC did not challenge the denial of its motion with a prehearing petition to this court for extraordinary relief. Instead, the hospital went ahead with the court hearing and lost on the merits. Only now, on appeal from the adverse judgment, has the hospital sought review of the court's discretionary pretrial ruling. But on this point, *Reid* v. *Balter* (1993) 14 Cal.App.4th 1186 [18 Cal.Rptr.2d 287] is dispositive.

In *Reid* the trial court denied a defense motion for a discretionary dismissal based on delay in prosecution and defendants lost in a jury trial.[3] They sought a reversal of the judgment based on the court's pretrial refusal to dismiss the action. The appellate panel recognized there was no point in debating whether the court in fact abused its discretion. Instead, the reviewing court assumed "arguendo the trial court abused its discretion in not granting defendants' motion for discretionary dismissal" (14 Cal.App.4th at

---

[2]It is also the hospital's most insistent line of attack. Quantity is not the sine qua non of effective appellate advocacy, of course; but FVRHMC allotted 40 of the 49 pages in the opening brief to this first issue.

[3]The case had been dismissed once when plaintiffs did not appear for a status conference. The dismissal was vacated, however, without prejudice to a defense motion to dismiss for delay in prosecution.

p. 1195) and then concluded the presumed error did not compel reversal: "When an appeal is taken from a judgment and the appellant alleges the trial court made an erroneous pretrial ruling, it is not enough to show that the ruling was indeed erroneous. In addition, the appellant must also 'show resulting prejudice, and the probability of a more favorable outcome, *at* trial.' (*Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 832 [16 Cal.Rptr.2d 38] [relying on both statutory law ([Code Civ. Proc.,] § 475) and constitutional law (Cal. Const., art. VI, § 13)].) [¶] . . . [Here,] defendants have not made a sufficient showing that they were prejudiced at trial by the denial of their motion and that it was probably this prejudice that caused the verdict to go against them. While the record does contain defendants' attorney's declaration wherein he stated that because of the passage of time in this case, [defense] witnesses . . . were not available for trial, this declaratory evidence is too . . . conclusionary [and] . . . we are unable to determine just how, if at all, they were *actually* prejudiced at trial by the court's denial of their motion to dismiss. On such a showing we cannot conclude that the trial court's allegedly erroneous ruling rendered the ultimate result in this case unjust."[4] (14 Cal.App.4th at p. 1195.)

The court added, "There is another reason for denying defendants appellate relief now, a strong public policy reason. After their motion for discretionary dismissal was denied, and prior to trial, defendants had the option of seeking pretrial review by petitioning for a writ of mandamus to compel the trial court to grant their motion to dismiss. Instead, defendants let this case proceed to trial, hereby expending the trial court's, the plaintiffs', and their own resources in both trial and posttrial proceedings, proceedings which defendants now contend should never have taken place. [¶] While the discretionary dismissal statute was enacted for the benefit of defendants named in lawsuits, it was also enacted for the public's benefit, i.e., to expedite the administration of justice by declogging court calendars and putting an end to elderly cases. [Citation.] By letting this case proceed to trial instead of petitioning for mandamus relief when their motion to dismiss was denied, defendants thwarted both purposes of the statute. It was counterproductive to wait until *after* the case had proceeded to trial and judgment to request review of the order denying dismissal. As defendants failed to seek a pretrial resolution of the dismissal issue, we are not inclined to now disturb plaintiffs' victory on the merits." (14 Cal.App.4th at pp. 1195-1196.) Neither am I.

---

[4]As an aside, I note FVRHMC was prejudiced by the denial of the motion for a discretionary dismissal only in the sense that had the petition not been tried on the merits, the hospital could not have lost. But, as the Supreme Court observed in *Denham* v. *Superior Court, supra*, 2 Cal.3d at page 566, this sort of "prejudice" is not the kind that results in a miscarriage of justice.

Justice Sonenshine seems to have been persuaded by the sheer weight of the hospital's effort to establish the trial court's erroneous denial of the motion to dismiss. But the hospital's effort is wasted, in my view. Like the appellate panel in *Reid*, I am perfectly willing to assume the trial court abused its discretion and proceed directly to the pertinent questions: Was defendant prejudiced by the delay in prosecution? Did that prejudice contribute to the adverse verdict? Was there a miscarriage of justice? Each of these questions must be answered in the negative.

Typically, prejudice from an unwarranted delay in prosecution that could "cause[] the verdict to go against" (14 Cal.App.4th at p. 1195) a defendant stems from the unavailability of witnesses critical to the defense. That was not a factor here, of course, because the superior court was a limited to a review of the administrative record and no witnesses were called. But the potential for prejudice to the hospital by an unwarranted delay in prosecuting this writ petition existed in two other areas. With a favorable judgment on this petition, Oskooi would be in a position to sue the hospital for damages. Damages based on a five-year loss of privileges could be significantly greater than those based on only a one-year suspension; but the trial court anticipated this issue and included a provision in the judgment that effectively limits the award of any damages to losses incurred only to September 2, 1989, the first anniversary of the filing of the petition.

The second potential problem concerned the hospital's responsibility to reinstate Oskooi. As the judgment recites, however, even though the summary suspension was not supported by substantial evidence, Oskooi's long delay in bringing the petition to resolution made it unfair to order his reinstatement. Accordingly, the hospital is under no obligation to ever reinstate this physician.

In short, the trial court's careful consideration of this matter eliminated the potential that its error, if any, would prejudice the hospital and result in a miscarriage of justice. Accordingly, I would proceed directly to the merits, as has Justice Sills.

## II

But, I cannot agree with Justice Sill's analysis, either. Per Code of Civil Procedure section 1094.5, subdivision (d), "in cases arising from private hospital boards . . . abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." And our "scope of our review . . . in this case is identical with that of the superior court. The same substantial evidence standard

applies, and the issue is whether the findings of the [private hospital board] were based on substantial evidence in light of the entire administrative record. [Citations.] Moreover, because the trial court [does] not exercise its independent judgment in reviewing the [b]oard decision, but instead applie[s] the substantial evidence test, we must examine the findings made by the [b]oard itself to determine whether they were supported by substantial evidence, rather than limiting ourselves to a review of the findings made by the trial court." (*Desmond* v. *County of Contra Costa* (1993) 21 Cal.App.4th 330, 334-335 [25 Cal.Rptr.2d 842].) Accordingly, I turn to the administrative record.

There we learn Oskooi graduated from medical school in 1961. He submitted a form application for appointment to the medical staff of FVRHMC, then known as Fountain Valley Community Hospital, on March 5, 1986. Item 6 on the application required him to "[l]ist all current and previous hospital affiliations, starting with most current (include assistantships and appointments)." The form provided lines for four entries. The general instructions at the beginning of the form advised, "If more space is needed than provided on original, attach additional sheets." Oskooi had eight previous hospital affiliations, but he included only the most recent four and did not attach a separate sheet for his hospital affiliations between 1971 and 1985.

In response to item 13, however, the physician indicated he was in practice in Peoria and Maui during that 15-year period, and he truthfully responded in item 15 that his privileges had never been suspended, revoked, not renewed, or denied, and that he had never been disciplined by any medical organization.

According to Oskooi, when he turned in the application, he asked a hospital clerk whether he should add a page for his previous hospital affiliations. He testified at the administrative hearing that he was told not to bother and that other doctors, whom he did not identify by name, made the same omissions without adverse consequences.[5]

Oskooi was granted surgical privileges. After he had been on staff at FVRHMC for more than a year, the executive committee summarily suspended him, alleging his judgment was "not up to the standards of the medical community." Oskooi appealed the suspension, and the hospital's own board determined it was not merited.

---

[5]This is the only evidence in the administrative record where there was a conflict. The physician designated to present the hospital's case asserted Oskooi's statement concerning the clerk's advice was a lie. No one called any percipient witness to resolve the dispute.

Within three weeks of this defeat, the hospital administrator wrote Oskooi and advised, "Upon review of your original application for medical staff membership it became apparent that you failed to complete item #6 Affiliations . . . . Because of these omissions, you are asked to supply a list of *all* current and previous hospital affiliations immediately." The letter also recited the prominent admonition on the application: "I FULLY UNDERSTAND THAT ANY SIGNIFICANT MIS-STATEMENTS IN OR OMISSIONS FROM THIS APPLICATION CONSTITUTE CAUSE FOR DENIAL OF APPOINTMENT OR CAUSE FOR *SUMMARY DISMISSAL* FROM THE MEDICAL STAFF. ALL INFORMATION SUBMITTED BY ME IN THIS APPLICATION IS TRUE TO MY BEST KNOWLEDGE AND BELIEF." (Italics added.)

Five days later, Oskooi responded and provided the requested information. He also noted in the letter that the information was always readily available from various other agencies and organizations, including the California and Orange County Medical Associations. Despite Oskooi's prompt response to the letter, the hospital summarily suspended his privileges the next day "due to significant omissions from your application for Medical Staff privileges and membership." The only basis for the suspension was the failure to list all previous hospital affiliations. The notice further advised Oskooi was "entitled to request a hearing as provided in Article VIII, part B [of the hospital bylaws] (attached)."

The administrative hearing was conducted at Oskooi's request. The hearing officer verbally confirmed the proceedings would be conducted according to the hospital's bylaws. That meant the hospital had the initial burden to explain its determination; then Oskooi had to go forward to show the decision was erroneous.

The hospital's evidence consisted solely of Oskooi's application and the recent correspondence concerning the missing hospital affiliations. When it was Oskooi's turn, he pointed out that article VIII, part B, section (a) of the bylaws give the hospital "the authority to suspend summarily all or any portion of the clinical privileges of an individual member of the medical staff *whenever such action must be taken immediately in the best interest of patient care or safety in the hospital, or for the continued effective operation of the hospital.*" (Italics added.) There is no dispute in this record that the hospital made no effort to establish the information omitted 18 months earlier had any adverse effect on patient care or safety or institutional operation. In fact, the physician designated to present the hospital's evidence, Harold Kravitz, M.D., asserted at the hearing, "And I want to just point out one other thing. [Oskooi] talks about summary suspension because of patient care. *That had nothing to do with the application.*" (Italics added.)

And that, in my view, is precisely why FVRHMC cannot prevail. The hospital's authority under its own bylaws to *summarily suspend* a physician's staff privileges is triggered only upon a demonstrable threat to patient care and safety or effective hospital operation. Under the bylaws in effect when this administrative record was created, no exception or special rules authorize a summary suspension based solely on incomplete applications. In sports terms, the hospital chose the game and printed the rules. When it lost, it attempted to change the score by telling everybody the rules did not apply—right out of Lewis Carroll. The hospital's decision was arbitrary and unsupported by substantial evidence.

Nor am I persuaded by Justice Sills's blithe, but literal, conclusion that "[a] dismissal is worse than a suspension." (Conc. opn., *ante*, at p. 250.) That may be true for those of us schooled only in the law. But for those in the medical profession, while a dismissal may be a consequence for a relatively benign transgression like submitting an incomplete staff application, a summary suspension brands the offending physician as someone whose conduct has threatened "patient care or safety in the hospital, or . . . the continued effective operation of the hospital." The record before us supports the notion that the hospital could have simply dismissed Oskooi for his application omission *after* a fair hearing. It does not, however, support the notion that the hospital could summarily suspend Oskooi for this reason.

Finally, a comment to Justice Sills's remark concerning " 'rudimentary' fair procedure" (conc. opn., *ante*, at p. 249) is necessary. Citing *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 555 [116 Cal.Rptr. 245, 526 P.2d 253], he concludes, "The essential elements of this 'rudimentary' fair procedure are (1) *notification of 'the reason for the proposed rejection'* and (2) 'a fair opportunity to defend.' " (Conc. opn., *ante*, at p. 249, italics added.) But *Pinsker* involved the denial of a physician's application for staff privileges, not the stripping of privileges previously granted, as in Oskooi's case. And the "notification for the proposed rejection" received by Oskooi carried with it the promise that, in order to prevail, the hospital would have to establish his conduct constituted a threat to patient care or safety or effective hospital administration. That is the only charge he had a fair opportunity to defend against. And, in my view, he succeeded.

In conclusion, I can only reiterate that my colleagues' reversal of this fairly fought and fairly won judgment is unjust. The superior court determined FVRHMC's summary suspension of Oskooi's staff privileges was

wrong.[6] To the extent the suspension affected Oskooi's ability to obtain staff privileges at other medical facilities, the judgment in his favor removed the impediment. But, laying responsibility for the delay in the resolution of this matter solely at Oskooi's feet, the court carefully crafted a judgment to ensure he could not take advantage of his procrastination in any subsequent damage suit against FVRHMC and flatly refused to order reinstatement of his staff privileges.[7] This court's reversal of the judgment means, however, that FVRHMC will unfairly escape all consequences of its wrongful conduct and Oskooi will unfairly be prevented from fully pursuing his chosen profession: "Beware the Jabberwock, my son! [¶] The jaws that bite, the claws that catch!"[8]

Appellant's petition for review by the Supreme Court was denied April 25, 1996.

---

[6]FVRHMC challenges this conclusion on appeal as well. I find no merit in its arguments.

[7]Oskooi wisely did not attack these elements of the judgment in a cross-appeal. His prayer to the court to strike the language intended to limit any damages in a subsequent civil action to those incurred in the approximately seven months after the summary suspension carries no legal weight.

[8]Carroll, Alice's Adventure in Wonderland & Through the Looking-Glass, *supra*, page 117.